JORDAN, Circuit Judge
 

 Timothy Nixon was a troubled man. After stealing a firearm, he told his partner, Nicole Haberle, that he was going to commit suicide. When a police officer employed
 by the Borough of Nazareth learned of that threat, he did not wait for trained crisis support professionals but instead knocked on the door of the apartment where Nixon was located and announced his presence. Nixon immediately shot himself.
 

 Ms. Haberle has sued, on her own behalf and also as the administrator of Nixon's estate, claiming that that police officer-Daniel Troxell-and other law enforcement officers, and the Borough, violated the Constitution as well as a variety of federal and state statutes. All of her claims were dismissed by the District Court, and she now appeals. Her primary argument is that Troxell unconstitutionally seized Nixon and that Nixon's suicide was the foreseeable result of a danger that Troxell created. She also argues that the Borough violated the Americans with Disabilities Act,
 
 42 U.S.C. §§ 12101
 
 - 213 (the "ADA"), by, among other things, failing to modify Borough policies, practices, and procedures to ensure that disabled individuals would have their needs met during interactions with the police. Although we recognize the grief borne by those who cared deeply for Mr. Nixon, we are nonetheless persuaded that the District Court was largely correct in its disposition of this case. But, because we conclude that Ms. Haberle should be given an opportunity to amend her complaint with respect to her ADA claim, we will affirm in part and vacate in part the District Court's rulings, and remand for further proceedings.
 

 I. BACKGROUND
 

 [1]
 

 Timothy Nixon suffered from a variety of mental health problems, including depression. For years, he had lived off and on with his long-time partner, Ms. Haberle, and their two children. On May 20, 2013, he had "a serious mental health episode involving severe depression." (Opening Br. at 6.) He called Haberle and told her that he was suicidal, and then broke into a friend's home and took a handgun. He next went to his cousin's apartment.
 

 Fearing for Nixon's life, Haberle contacted the Borough of Nazareth Police Department. Officer Daniel Troxell obtained a warrant for Nixon's arrest, and, having learned that Nixon was still at his cousin's apartment, Troxell went there, accompanied by other officers from the Borough and surrounding municipalities.
 
 [2]
 
 Upon arriving at the apartment, some of the officers suggested setting up a perimeter and asking the Pennsylvania State Police to send crisis negotiators. Others suggested asking Haberle to help communicate with Nixon. Troxell rebuffed those suggestions, calling the other officers "a bunch of f[---]ing pussies." (App. at 7.) He declared his intention to immediately go to the apartment, because "[t]his is how we do things in Nazareth." (App. at 7.) He did as he said, knocked on the door of the apartment, and identified himself as a police officer. Nixon then promptly went into one of the bedrooms of the apartment and turned the stolen gun on himself.
 

 Following the suicide, Haberle sued Troxell, the other officers who were at the scene, the chief of police of Nazareth, the Mayor of Nazareth, and various members of the Borough Council, including the President and Vice-President, and the Borough of Nazareth itself. Her complaint, as
 amended, included eleven counts.
 
 [3]
 
 The Defendants moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss the amended complaint, and that motion was granted. The District Court did not grant Haberle an opportunity to further amend her complaint, concluding that any additional amendment would be futile. This timely appeal followed.
 

 II. DISCUSSION
 

 [4]
 

 Haberle focuses on three arguments-two under provisions of the Constitution and one under the Americans with Disabilities Act. Specifically, she alleges that dismissal of her claims against Troxell was improper because Troxell's actions amounted to an unconstitutional seizure in violation of the Fourth Amendment. She also claims that Troxell's actions constituted a "state-created danger" in violation of the Due Process Clause of the Fourteenth Amendment.
 
 [5]
 
 Finally, she argues that the Borough violated the ADA. None of those arguments is persuasive.
 

 A. Troxell's Actions Did Not Constitute an Improper Seizure
 

 Police are entitled to "knock and talk" with people in a residence, and doing so is not a seizure under the Fourth Amendment.
 
 Estate of Smith v. Marasco
 
 ,
 
 318 F.3d 497
 
 , 519 (3d Cir. 2003) (citing
 
 Rogers v. Pendleton
 
 ,
 
 249 F.3d 279
 
 , 289-90 (4th Cir. 2001) ). In order to effectuate a seizure, there must be something more than "inoffensive contact between a member of the public and the police...."
 
 United States v. Mendenhall
 
 ,
 
 446 U.S. 544
 
 , 555,
 
 100 S.Ct. 1870
 
 ,
 
 64 L.Ed.2d 497
 
 (1980). There must be, for instance, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, ... the use of language or tone of voice indicating that compliance with the officer's request might be compelled," or some other communication that would convey to a reasonable person that compliance was not optional.
 

 Id.
 

 at 554
 
 ,
 
 100 S.Ct. 1870
 
 . "[T]he subjective intention of the [officers] ... is irrelevant except insofar as that may have been conveyed to the respondent."
 

 Id.
 

 at 554 n.6,
 
 100 S.Ct. 1870
 
 .
 

 In this case, the District Court correctly concluded that there was no seizure. Whether or not well-advised, and despite his crudely expressed intentions, Troxell merely knocked on the door and announced his presence. That alone is not enough to violate the Fourth Amendment. There is no allegation that Troxell made intimidating remarks to Nixon or announced his presence in a threatening fashion. Nor is there any allegation that Nixon was aware of the warrant or of the other officers that were outside of the apartment complex. The complaint gives no reason to believe that Nixon felt he was "not free to leave,"
 

 id.
 

 at 554
 
 ,
 
 100 S.Ct. 1870
 
 , or that he was unable to "decline the [officer's] requests or otherwise terminate the encounter."
 
 Florida v. Bostick
 
 ,
 
 501 U.S. 429
 
 , 436,
 
 111 S.Ct. 2382
 
 ,
 
 115 L.Ed.2d 389
 
 (1991). Because Nixon's liberty was not restricted, there was no seizure.
 
 See
 

 Estate of Bennett v. Wainwright
 
 ,
 
 548 F.3d 155
 
 , 171 (1st Cir. 2008) ("Given the Estate's failure to establish [the decedent's] knowledge of the [police] perimeter, no reasonable factfinder could find that a person in [the decedent's] circumstances would have thought that the perimeter restricted his liberty to leave the ... residence.").
 

 In any event, Troxell acted under color of a warrant, and Haberle does not argue that the warrant was invalid or was obtained under false pretenses or would have resulted in a false arrest. Even if a seizure had occurred, then, it would not have been unlawful.
 
 See
 

 Berg v. Cty. of Allegheny
 
 ,
 
 219 F.3d 261
 
 , 273 (3d Cir. 2000) (explaining that an officer is immune from suit after an arrest based on a warrant, if there is a reasonable belief that the warrant is valid).
 

 B. Troxell's Actions Did Not Cause a State-Created Danger
 

 As a general principle, the government has no obligation under the Due Process Clause of the Fourteenth Amendment to protect citizens against injuries caused by private actors.
 
 DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,
 

 489 U.S. 189
 
 , 197,
 
 109 S.Ct. 998
 
 ,
 
 103 L.Ed.2d 249
 
 (1989). That includes a self-inflicted injury.
 
 Sanford v. Stiles
 
 ,
 
 456 F.3d 298
 
 , 303-04 (3d Cir. 2006). There is, however, an obligation to protect individuals against dangers that the government itself creates.
 
 Bright v. Westmoreland Cty.
 
 ,
 
 443 F.3d 276
 
 , 281 (3d Cir. 2006). We have identified four elements for a claim under the "state-created danger" doctrine:
 

 (1) [T]he harm ultimately caused was foreseeable and fairly direct;
 

 (2) a state actor acted with a degree of culpability that shocks the conscience;
 

 (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
 

 (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.
 

 Id.
 

 (citations, footnotes, and internal quotation marks omitted). The District Court here considered the second element in particular and determined that Officer Troxell's conduct lacked "a degree of culpability that shocks the conscience."
 
 Id
 
 . We agree with that assessment.
 
 [6]
 

 For behavior by a government officer to shock the conscience, it must be more egregious than "negligently inflicted harm," as mere negligence "is categorically beneath the threshold of constitutional due process."
 
 Cty. of Sacramento v. Lewis
 
 ,
 
 523 U.S. 833
 
 , 849,
 
 118 S.Ct. 1708
 
 ,
 
 140 L.Ed.2d 1043
 
 (1998). Instead, "only the most egregious official conduct can be said to" meet that standard.
 

 Id.
 

 at 846
 
 ,
 
 118 S.Ct. 1708
 
 .
 

 The required degree of culpability varies based on the "the circumstances of each case," and, in particular, on the time pressure under "which the government actor[ ] had to respond...."
 
 Phillips v. Cty. of Allegheny
 
 ,
 
 515 F.3d 224
 
 , 240 (3d Cir. 2008). Split-second decisions taking place in a "hyperpressurized environment," usually do not shock the conscience unless they are done with "an intent to cause harm."
 
 Sanford
 
 ,
 
 456 F.3d at 309
 
 . At the other end of the continuum, actions taken after time for "unhurried judgments" and careful deliberation may shock the conscience if done with deliberate indifference.
 

 Id.
 

 (quoting
 
 Lewis
 
 ,
 
 523 U.S. at 853
 
 ,
 
 118 S.Ct. 1708
 
 ). In the middle are actions taken under "hurried deliberation."
 
 Id.
 
 at 310. Such situations involve decisions that need to be made "in a matter of hours or minutes."
 
 Ziccardi v. City of Philadelphia
 
 ,
 
 288 F.3d 57
 
 , 65 (3d Cir. 2002). If that standard applies, then an officer's actions may shock the conscience if they reveal a conscious disregard of "a great risk of serious harm rather than a substantial risk."
 
 Sanford
 
 ,
 
 456 F.3d at 310
 
 .
 

 Not surprisingly, Troxell urges us to adopt the split-second standard, while Haberle presses for the unhurried judgment standard. The District Court applied the intermediate standard-the one for situations involving "hurried deliberation,"
 

 id.
 

 at 309
 
 , and that was correct. Nixon had expressed suicidal tendencies and had stolen a deadly weapon. There was not time for casual deliberation. On the other hand, a few hours had passed since Nixon stole the gun and there was no indication that the situation was escalating or otherwise required instantaneous action by Troxell. Therefore, the District Court properly applied the intermediate standard and asked whether Troxell's actions showed conscious disregard of a great risk of harm to Nixon.
 

 The decision Troxell made to ignore the advice of other officers and knock on the apartment door falls beneath the threshold of conscious disregard. Haberle describes Troxell's actions as "Ramboesque vigilantism,"
 

 (Opening Br. at 24), but the fact that Troxell chose to immediately knock while other officers counseled waiting manifests only a disagreement over how to manage a risk, not a disregard of it. As the District Court noted, "[u]nder the circumstances that the officers were confronting, any decision they could have made ... was not free from risk to Nixon, the other occupants of the apartment, or the officers." (App. at 16-17.) Nixon's suicide is surely tragic, and, in its aftermath "it is natural to second-guess the decisions of Troxell," (App. at 17), but we cannot say that what he did shocks the conscience.
 

 C. Haberle Has Not Pled a Compensable Claim Under the ADA
 

 The final issue on appeal involves Haberle's claim that the Borough violated the ADA. She argues that she is entitled to money damages because the Borough "fail[ed] to make reasonable modifications to [its] policies, practices and procedures to ensure that [Nixon's] needs as an individual with a disability would be met." (App. at 87.) While we agree that, in general, the ADA applies to arrest situations, Haberle fails to state a claim for damages under that statute because she does not allege facts showing that any inaction of the Borough reflects deliberate indifference.
 

 1. The ADA Generally Applies When Police Officers Make an Arrest
 

 As a threshold matter, we consider whether the ADA applies when police officers make an arrest. Although the question is debatable, we think the answer is generally yes.
 
 [7]
 
 Our analysis begins with the statutory text.
 
 See
 

 Ross v. Blake
 
 , --- U.S. ----,
 
 136 S.Ct. 1850
 
 , 1856,
 
 195 L.Ed.2d 117
 
 (2016) ("Statutory interpretation, as we always say, begins with the text...."). To successfully state a claim under Title II of the ADA, a person "must demonstrate: (1) he is a qualified individual; (2) with a disability; (3) [who] was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability."
 

 Bowers v. Nat'l Collegiate Athletic Ass'n
 
 ,
 
 475 F.3d 524
 
 , 553 n.32 (3d Cir. 2007).
 
 [8]
 
 The first question, then, is whether arrestees can be "qualified individuals" under the ADA, and the best response is that they can, for there is nothing to categorically exclude them from the statute's broad coverage.
 
 [9]
 

 See
 

 Gorman v. Bartch
 
 ,
 
 152 F.3d 907
 
 , 912-13 (8th Cir. 1998) (concluding that an arrestee could be a qualified individual under the ADA despite not having " 'volunteered' to be arrested");
 
 cf.
 

 Pa. Dep't of Corr. v. Yeskey
 
 ,
 
 524 U.S. 206
 
 , 210-11,
 
 118 S.Ct. 1952
 
 ,
 
 141 L.Ed.2d 215
 
 (1998) (noting that a state prisoner could be a "qualified individual" under the ADA even when participation in a service, program, or activity of the State is not voluntary).
 

 The second question is whether arrestees may have disabilities covered by the ADA, and the answer to that is clearly "yes."
 
 See
 

 42 U.S.C. § 12102
 
 (1) (defining "disability" for purposes of the ADA). Like the overall population, the subset of people who violate the law, or are suspected of such, will naturally include those with recognized disabilities. The dragnet, so to speak, gathers of every kind.
 

 Saving the third qualifying question for last, we next note that the fourth requirement, that the claimant has been excluded from a service, program, or activity or discriminated against by reason of his disability, is also one that can be satisfied in the context of an arrest. If the arrestee's "disability 'played a role in the ... decisionmaking process and ... had a determinative effect on the outcome of that process[,]' "
 
 i.e.
 
 , if the arrestee's disability was a "but for" cause of the deprivation or harm he suffered, then the fourth element of an ADA claim has been met.
 
 See
 

 CG v. Pa. Dep't of Educ.
 
 ,
 
 734 F.3d 229
 
 , 236 n.11 (3d Cir. 2013) (quoting
 
 New Directions Treatment Servs. v. City of Reading
 
 ,
 
 490 F.3d 293
 
 , 300 n.4 (3d Cir. 2007) ).
 

 The most controversial question pertinent to whether the ADA applies when police officers are making arrests comes in the context of the statute's third requirement. We must consider whether arrests made by police officers are "services, programs, or activities of a public entity," or alternatively, whether police officers may be liable under the ADA for "subject[ing a qualified individual] to discrimination" while effectuating an arrest.
 
 42 U.S.C. § 12132
 
 .
 

 The text of the ADA is deliberately broad and police departments "fall[ ] 'squarely within the statutory definition of
 a "public entity." ' "
 
 Gorman
 
 ,
 
 152 F.3d at 912
 
 (quoting
 
 Yeskey
 
 ,
 
 524 U.S. at 210
 
 ,
 
 118 S.Ct. 1952
 
 );
 
 see
 

 42 U.S.C. § 12131
 
 (1)(A)-(B) (defining "public entity" to include, among other things, "any State or local government" and "any department, agency, special purpose district, or other instrumentality of a State or States or local government");
 
 see also
 

 Yeskey
 
 ,
 
 524 U.S. at 209-10
 
 ,
 
 118 S.Ct. 1952
 
 (concluding that state prisons are public entities under the ADA because "the ADA plainly covers state institutions ..."). Furthermore, persuasive precedent indicates that the ADA's reference to "the services, programs, and activities of a public entity" should likewise be interpreted broadly "to 'encompass[ ] virtually everything that a public entity does.' "
 
 Babcock v. Michigan
 
 ,
 
 812 F.3d 531
 
 , 540 (6th Cir. 2016) (alteration in original) (quoting
 
 Johnson v. City of Saline
 
 ,
 
 151 F.3d 564
 
 , 569 (6th Cir. 1998) );
 
 see also
 

 Yeskey v. Comm. of Pa. Dep't of Corr.
 
 ,
 
 118 F.3d 168
 
 , 171 (3d Cir. 1997) (noting that similar "broad language" in the ADA's implementing regulations was "intended to appl[y] to anything a public entity does" (alteration in original) (internal quotation marks omitted) ),
 
 aff'd
 
 ,
 
 524 U.S. 206
 
 ,
 
 118 S.Ct. 1952
 
 ,
 
 141 L.Ed.2d 215
 
 (1998). Nevertheless, courts across the country are divided on whether police fieldwork and arrests can rightly be called "services, programs, or activities of a public entity...."
 
 42 U.S.C. § 12132
 
 .
 
 [10]
 

 Fortunately, we do not need to resolve that issue in this case, because § 12132 is framed in the alternative and we can look instead to the second phrase, namely, to whether the arrestee was "subjected to discrimination" by the police.
 

 Id.
 

 ;
 
 see also
 

 Bircoll v. Miami-Dade Cty.
 
 ,
 
 480 F.3d 1072
 
 , 1084 (11th Cir. 2007) (concluding that the court did not need to decide "whether police conduct during an arrest is a program, service, or activity covered by the ADA" because a plaintiff "could still attempt to show an ADA claim under the final clause in the Title II statute"). The "subjected to discrimination" phrase in Title II is "a catch-all phrase that prohibits all discrimination by a public entity, regardless of the context."
 
 Bircoll
 
 ,
 
 480 F.3d at 1085
 
 (quoting
 
 Bledsoe v. Palm Beach Cty. Soil & Water Conservation Dist.
 
 ,
 
 133 F.3d 816
 
 , 821-22 (11th Cir. 1998) );
 
 accord
 

 Seremeth v. Bd. of Cty. Comm'rs Frederick Cty.
 
 ,
 
 673 F.3d 333
 
 , 338 (4th Cir. 2012) ;
 
 Innovative Health Sys., Inc. v. City of White Plains
 
 ,
 
 117 F.3d 37
 
 , 44-45 (2d Cir. 1997),
 
 overruled on other grounds by
 

 Zervos v. Verizon N.Y., Inc.
 
 ,
 
 252 F.3d 163
 
 (2d Cir. 2001). Moreover, we have said that "[d]iscrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities."
 
 Taylor v. Phoenixville Sch. Dist.
 
 ,
 
 184 F.3d 296
 
 , 306 (3d Cir. 1999). It follows, then, that police officers may violate the ADA when making an arrest by failing to provide reasonable accommodations for a qualified arrestee's disability, thus subjecting him to discrimination. Given that catchall, we believe that the ADA can indeed apply to police conduct during an arrest.
 

 That conclusion, which is suggested by the wide scope of the ADA's text, has
 support from our sister circuits.
 
 See, e.g.
 
 ,
 
 Sheehan
 
 , 743 F.3d at 1217 ("Title II of the [ADA] applies to arrests.");
 
 Roberts v. City of Omaha
 
 ,
 
 723 F.3d 966
 
 , 973 (8th Cir. 2013) ("[T]he ADA ... appl[ies] to law enforcement officers taking disabled suspects into custody."). Even though there is some disagreement concerning the point during a law enforcement encounter at which the ADA applies to police conduct, no court of appeals has held that the ADA does not apply at all.
 
 See, e.g.
 
 ,
 
 Hainze v. Richards
 
 ,
 
 207 F.3d 795
 
 , 801 (5th Cir. 2000) (holding "that Title II does not apply to an officer's on-the-street responses to reported disturbances or other incidents ... prior to the officer's securing the scene and ensuring that there is no threat to human life");
 
 Gohier v. Enright
 
 ,
 
 186 F.3d 1216
 
 , 1221 (10th Cir. 1999) ("[A] broad rule categorically excluding arrests from the scope of Title II ... is not the law.").
 
 [11]
 

 2. Haberle Does Not Allege Deliberate Indifference
 

 Even though the ADA generally applies in the arrest context, Haberle's claim for money damages against the Borough fails as a matter of law because she has not adequately pled that the Borough acted with deliberate indifference to the risk of an ADA violation. She seeks compensatory damages from the Borough under the ADA, but that remedy is not available absent proof of "intentional discrimination."
 
 S.H. ex rel. Durrell v. Lower Merion Sch. Dist.
 
 ,
 
 729 F.3d 248
 
 , 261 (3d Cir. 2013) ("[C]laims for compensatory damages under ... § 202 of the ADA also require a finding of intentional discrimination."). To prove intentional discrimination, an ADA claimant must prove at least deliberate indifference,
 

 id.
 

 at 263
 
 , and to plead deliberate indifference, a claimant must allege "(1) knowledge that a federally protected right is substantially likely to be violated ... and (2) failure to act despite that knowledge."
 

 Id.
 

 at 265
 
 (emphasis omitted).
 

 Haberle, however, fails to allege that the Borough was aware that its existing policies made it substantially likely that disabled individuals would be denied their federally protected rights under the ADA. She could have met that obligation in two different ways: first, by alleging facts suggesting that the existing policies caused a failure to "adequately respond to a pattern of past occurrences of injuries like the plaintiffs,' " or, second, by alleging facts indicating that she could prove "that the risk of ... cognizable harm was 'so great and so obvious that the risk and the failure ... to respond will alone' support finding" deliberate indifference.
 
 Beers-Capitol v. Whetzel
 
 ,
 
 256 F.3d 120
 
 , 136-37 (3d Cir. 2001) (quoting
 
 Sample v. Diecks
 
 ,
 
 885 F.2d 1099
 
 , 1118 (3d Cir. 1989) (in the context of § 1983 suits by prison inmates) );
 
 see
 

 S.H. ex rel. Durrell
 
 ,
 
 729 F.3d at
 
 263 n.23 (noting that the standard for proving deliberate indifference being adopted for the ADA context "is consistent with our standard of deliberate indifference in the context of § 1983 suits by prison inmates").
 

 Haberle's complaint does neither. She relies on general allegations that the Borough has "a history of violating the civil rights of residents[,]" (App. at 76), offering only hazy support for that statement. Even if she could ultimately prove a generalized history of civil rights violations, that would not necessarily demonstrate "a pattern of past occurrences of injuries
 
 like the plaintiff
 
 [
 
 's
 
 .]"
 
 Beers-Capitol
 
 ,
 
 256 F.3d at 136
 
 (emphasis added). Because those other vaguely referenced violations have not been adequately alleged to be "similar to the violation at issue here, they could not have put [the Defendant] on notice" that policies, practices, and procedures had to be changed.
 
 Connick v. Thompson
 
 ,
 
 563 U.S. 51
 
 , 63,
 
 131 S.Ct. 1350
 
 ,
 
 179 L.Ed.2d 417
 
 (2011). Nevertheless, with respect to that defect, Haberle should be given an opportunity to amend her complaint, if possible, to salvage her ADA claim against the Borough, since this failure in her complaint is not one as to which we can say definitively that amendment would be futile.
 
 [12]
 

 Haberle also complains that "a set of policies and procedures had been drafted by the Department" which should have guided "interact[ion] with mentally disturbed individuals, and those in crisis situations[,]" but that "the said policies and procedures were not adopted by the Borough Council, nor were they implemented by the Mayor or Police Department." (App. at 78-79.) Yet Haberle does not allege any facts indicating that the policies were drafted because of an awareness that the pre-existing policies were substantially likely to lead to a violation of citizens' rights. Absent such awareness, a municipality cannot be found to be deliberately indifferent merely for considering but not yet adopting new policies or amendments to old ones. To impose liability on that basis would create a perverse deterrent to voluntary reform.
 

 Haberle likewise fails to allege that the risk of harm was "so great and so obvious," as to obviate the need for her to allege facts pertaining to the Borough's knowledge.
 
 Beers-Capitol
 
 ,
 
 256 F.3d at 136
 
 (quoting
 
 Sample
 
 ,
 
 885 F.2d at
 
 1118 ). At most, she claims that the Borough's conduct falls "beneath the nationally recognized standards for police department operations" with regard to those with mental illness. (App. at 75.) But, assuming that is true, falling below national standards does not, in and of itself, make the risk of an ADA violation in such circumstances "so patently obvious that a [municipality] could be held liable" without "a pre-existing pattern of violations."
 

 Connick
 
 ,
 
 563 U.S. at 64
 
 ,
 
 131 S.Ct. 1350
 
 . As the District Court explained, "[t]he failure to train police officers to refrain from doing so much as knocking on the door when they receive a call that a mentally ill individual has stolen a firearm, is contemplating suicide, and may be in the presence of others whose status is unknown is not so obvious [a deficiency] that the Borough could be said to have been deliberately indifferent to the need for that training." (App. at 22.)
 

 III. CONCLUSION
 

 For the foregoing reasons, we will affirm in part and vacate in part the District Court's dismissal of Haberle's claims, and remand for further proceedings consistent with this opinion.
 

 When reviewing a decision to grant a motion to dismiss, we "accept as true all well-pleaded facts and allegations, and must draw all reasonable inferences therefrom in favor of the plaintiff."
 
 Bell v. Cheswick Generating Station
 
 ,
 
 734 F.3d 188
 
 , 193 n.5 (3d Cir. 2013).
 

 According to Haberle, Nixon was not a danger to anyone and was peacefully drinking beer with his cousin. She does not, however, allege that Troxell knew what was happening inside the apartment.
 

 Haberle had been allowed to amend her complaint under the safe harbor provisions of Federal Rule of Civil Procedure 11(c)(2) to remove some inflammatory rhetoric in the initial pleading. The amended complaint includes claims listed as "[c]ounts." (
 
 See
 
 App. at 81-89.) The first six claims were brought under
 
 42 U.S.C. § 1983
 
 . Count one claimed that Troxell had violated the Fourth and Fourteenth Amendments in a variety of ways, including depriving Nixon of his right to bodily integrity, freedom from unreasonable searches and seizures, freedom from state-created dangers, and freedom from arbitrary conduct that shocks the conscience. Count two claimed that all of the officers denied Nixon needed medical care. Count three was against the officers other than Troxell and alleged a failure to intervene to prevent unconstitutional conduct. Count four attempted to hold Troxell's superiors responsible for Troxell's conduct. Count five alleged municipal liability for a failure to train. Count six involved an allegation of civil conspiracy. The seventh count alleged violations of the ADA by the Borough. The remaining counts claimed violations of state law, including intentional infliction of emotional distress, negligent infliction of emotional distress, wrongful death, and a survivorship action for lost revenue and pain and suffering.
 

 The District Court had jurisdiction over Haberle's federal claims under
 
 28 U.S.C. §§ 1331
 
 and 1343. It had supplemental jurisdiction over her state law claims under
 
 28 U.S.C. § 1367
 
 . We have jurisdiction pursuant to
 
 28 U.S.C. § 1291
 
 . Our review of the District Court's dismissal order is
 
 de novo
 
 .
 
 Phillips v. Cty. of Allegheny,
 

 515 F.3d 224
 
 , 230 (3d Cir. 2008).
 

 Haberle has standing to bring her § 1983 claims on behalf of Nixon as the administrator of his estate.
 
 Giles v. Campbell
 
 ,
 
 698 F.3d 153
 
 , 156 (3d Cir. 2012) (explaining that the survival of claims is determined by reference to "the common law, as modified and changed by the constitution and statutes of the [forum] State," unless inconsistent with federal law, and that " 'the survival of civil rights of actions under § 1983 upon the death of either the plaintiff or defendant' was an area not covered by federal law" (alteration in original) (quoting
 
 Robertson v. Wegmann
 
 ,
 
 436 U.S. 584
 
 , 588,
 
 98 S.Ct. 1991
 
 ,
 
 56 L.Ed.2d 554
 
 (1978) ) );
 
 see also
 
 42 Pa. Cons. Stat. Ann. § 8302 ("All causes of action or proceedings, real or personal, shall survive the death of the plaintiff or of the defendant, or the death of one or more joint plaintiffs or defendants."). Haberle likewise has standing to bring the ADA claim even after Nixon's death-either under federal common law or based on Pennsylvania law.
 
 Compare
 

 Guenther v. Griffin Constr. Co., Inc.
 
 ,
 
 846 F.3d 979
 
 , 982 (8th Cir. 2017) (concluding that an ADA claim survives the death of an injured party under federal common law),
 
 with
 

 Slade for Estate of Slade v. U.S. Postal Serv.
 
 ,
 
 952 F.2d 357
 
 , 360 (10th Cir. 1991) (applying state law to determine that a survivorship claim was permissible under the ADA).
 

 A "state-created danger" may exist where a state actor either creates a harmful situation or increases a citizen's exposure or vulnerability to an already-present danger.
 
 See
 

 Bright v. Westmoreland Cty.
 
 ,
 
 443 F.3d 276
 
 , 281-82 (3d Cir. 2006) (discussing the state-created danger doctrine).
 

 Because Troxell's conduct does not shock the conscience, we do not address the other prongs of the "state-created danger" doctrine. Before the District Court and again on appeal, Troxell argued that the "state-created danger" claim against him should be barred by qualified immunity. The District Court did not address qualified immunity, and, given our disposition of the claim, neither do we.
 

 According to Haberle, even if her ADA claim against the Borough was meritless at the point of arrest, it should still survive because the Borough's failure to establish a suitable training program is, by itself, a violation of the ADA. To support her theory, Haberle points to an opinion from the United States District Court for the Middle District of Pennsylvania,
 
 Schorr v. Borough of Lemoyne
 
 ,
 
 243 F.Supp.2d 232
 
 (M.D. Pa. 2003). In
 
 Schorr
 
 , the court concluded that whether there was an ADA claim on the day of the arrest was "irrelevant" because the purported injury did not occur the day of the police altercation but instead "occurred well before that day, when the ... policy makers failed to institute [policies] to accommodate disabled individuals ... by giving the officers the tools and resources to handle the situation peacefully."
 

 Id.
 

 at 238
 
 .
 

 Schorr
 
 is a thoughtful effort to address difficult issues but, ultimately, its reasoning misses the mark because it is incompatible with the text of the ADA. As the District Court here correctly observed, an ADA violation occurs if and when a disabled individual is "excluded from participation in" or "denied the benefits of the services, programs, or activities of a public entity" or is "subjected to discrimination by any such entity." (App. at 28 n.20 (quoting
 
 42 U.S.C. § 12132
 
 ).) A municipality's failure to train its police is not actionable unless and until that failure leads directly to a denial of a needed accommodation or improper discrimination. It is the denial that gives rise to the claim. Thus, contrary to the assertion in
 
 Schorr
 
 that ADA deprivations could occur before the day of the problematic incident between the citizen and the police, it is the incident itself that must be the focus of attention.
 

 The language of the statute itself is, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."
 
 42 U.S.C. § 12132
 
 .
 

 That arrestees can qualify does not, of course, mean that they necessarily will qualify. There remains a question whether a potentially violent person with mental health problems who, while possessing a gun, barricades himself in another person's apartment is a "qualified individual" under the ADA. The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."
 
 42 U.S.C. § 12131
 
 (2). We have previously noted that a "significant risk test" has been used to determine whether an individual is qualified to receive protection under the analogous Rehabilitation Act.
 
 See
 

 New Directions Treatment Servs. v. City of Reading
 
 ,
 
 490 F.3d 293
 
 , 303 (3d Cir. 2007). Whether application of that same test in the ADA context is appropriate, however, is not something that we need to address now. We reserve judgment on that issue for another day.
 

 The Supreme Court had granted certiorari to address that question,
 
 City & Cty. of San Francisco v. Sheehan
 
 , --- U.S. ----,
 
 135 S.Ct. 702
 
 ,
 
 190 L.Ed.2d 434
 
 (2014), but it later dismissed the writ as improvidently granted.
 
 City & Cty. of San Francisco v. Sheehan
 
 , --- U.S. ----,
 
 135 S.Ct. 1765
 
 , 1773-74,
 
 191 L.Ed.2d 856
 
 (2015). The issue thus continues to divide some federal courts.
 
 See generally
 
 Robyn Levin, Note,
 
 Responsiveness to Difference: ADA Accommodations in the Course of an Arrest
 
 ,
 
 69 Stan. L. Rev. 269
 
 (2017) (compiling cases).
 

 A successful ADA claim demands more than an allegation of an arrest of a qualified individual with a disability. The implementing regulations for the ADA make clear that there must also have been a failure to make reasonable accommodations.
 
 See
 

 28 C.F.R. § 35.130
 
 (b)(7)(i) (stating that public entities are only required to make "
 
 reasonable
 
 modifications in policies, practices, or procedures" to comply with the ADA (emphasis added) );
 
 see also
 

 42 U.S.C.A. § 12131
 
 (referencing "reasonable modifications to rules, policies, or practices" in defining "qualified individual");
 
 supra
 
 note 9. The analysis as to what is "reasonable" under the circumstances, including exigent circumstances, and as to how their determination is reached, presents complicated issues.
 
 See
 
 Levin,
 
 supra
 
 note 10. We have no occasion now to consider the analytical approach to an ADA claim arising from an arrest because we conclude that Haberle's ADA claim for money damages fails due to her failure to plead deliberate indifference. Nevertheless, in the future, we may need to consider whether and under what circumstances it is reasonable to require police officers to make accommodations during an arrest when they face an exigent threat.
 

 Haberle contends that the District Court erred in not granting her leave to amend her complaint again. She did not, however, "request[ ] leave to amend, nor suggest[ ] the existence of any allegations not contained in the Amended Complaint." (App. at 3.) On appeal, she has not pointed to any amendments that she would have made to her complaint if given the opportunity to do so. (Opening Br. at 24-25.) And it seems clear that she cannot make any amendment that would save her § 1983 claim, so granting leave to amend would be futile with respect to that claim.
 
 See
 

 Alston v. Parker
 
 ,
 
 363 F.3d 229
 
 , 235 (3d Cir. 2004) ("We have held that even when a plaintiff does not seek leave to amend, if a complaint is vulnerable to 12(b)(6) dismissal, a District Court must permit a curative amendment, unless an amendment would be inequitable or futile."). But Haberle should be given the narrow opportunity to amend her complaint with respect to her ADA claim, particularly her allegations of a history of civil rights violations by the Borough, because deliberate indifference was not discussed in the District Court as to that claim.