**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 21-1837

———————

UNITED STATES OF AMERICA

v.

DAMON TODD CAREY,

                                Appellant

———————

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Action No. 1-18-cr-00263-001)
U.S. District Judge: Sylvia H. Rambo

———————

Submitted Under Third Circuit L.A.R. 34.1(a)
June 8, 2023

Before:  HARDIMAN, AMBRO and FUENTES, <u>Circuit
Judges</u>

(Filed: July 7, 2023)

Damon Todd Carey
Devens FMC
P.O. Box 879
Ayer, MA 01432

*Pro Se Appellant*

Daryl F. Bloom
Carlo D. Marchioli
Office of United States Attorney
Middle District of Pennsylvania
Sylvia H. Rambo United States Courthouse
1501 N 6th Street, 2nd Floor
P.O. Box 202
Harrisburg, PA 17102

Samuel S. Dalke
Office of United States Attorney
228 Walnut Street, Suite 220
Harrisburg, PA 17101

*Counsel for Appellee United States of America*

———————

OPINION OF THE COURT

———————

AMBRO, <u>Circuit Judge</u>

Damon Carey appeals his convictions for drug trafficking and using a firearm in furtherance thereof. He

challenges, among other things, many of the District Court's evidentiary rulings, its calculation of his Guidelines range, and its refusal to grant a directed verdict in his favor. We reject most of his arguments. But we agree that insufficient evidence supports his conviction for possession with intent to distribute 500 grams or more of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a). We vacate that count and remand to the District Court for resentencing.

I.

On April 6, 2018, a fugitive task force of U.S. Marshals in Harrisburg, Pennsylvania staked out Carey's residence to arrest him for violating conditions of his supervised release. After Carey placed a large bag in the trunk of his rental car, he soon took the wheel and began to pull away. The task force moved quickly, effecting a vehicle containment maneuver by driving directly toward Carey. Hoping to evade interdiction, Carey "cut the wheel hard to the right and ended up striking a parked car" on the side of the street. App. 86. He was arrested after being pulled from the car. The task force then swept it, "looking for bodies[,] for persons[,] [and] for possible threats." App. 87. In the trunk, they found Carey's bag—opened. Inside it, they could see a brown shoe box that "had a big opening where you could put your thumb in . . . ." App. 541. Through that thumb hole, a member of the task force saw U.S. currency. The task force called the Harrisburg Bureau of Police. The Bureau's Vice and Organized Crime Unit arrived, and law enforcement opened the shoe box, which contained $79,320.

From Carey's residence, his pregnant girlfriend, Mikia Slone, heard the commotion. She immediately located two lime-sized bags of cocaine and a baby bottle of PCP, "ran to

3

the bathroom, and flushed what [she] could" down the toilet. App. 756–57. The Government's expert estimated that the bags of cocaine together contained around 112 grams of the drug.

After the crash, U.S. Marshals and Harrisburg Police headed to Carey's residence, where they were met by Slone. Some officers engaged her in small talk "right at the front door, possibly into the living room area," App. 92, while others secured the premises, App. 89, 94. Slone refused to consent to a search of the residence but indicated there was a loaded firearm in the upstairs bedroom (though she could not name the make or caliber). Eventually, she asked if she could leave the house to pick up her son. She was then escorted by police upstairs to obtain her shoes. While Slone and the police walked from the living room to the upstairs area, an investigator took photographs of the interior of the home. At the same time, one officer expressed his belief to Slone that "there were drugs in the house . . . ." App. 429. She responded by saying that although there was no crack or heroin, there was some marijuana in the duffel bags on the floor of the bedroom. Using Slone's statements and the cash recovered at the accident scene as support for probable cause, police applied for and obtained a search warrant for Carey's residence.[1]

---

[1] The police used the wrong street number in their warrant request because of a miscommunication by one of the officers. *See* App. 94 (Testimony of Detective Nicholas Ishman) ("I gave him the wrong house number. I told him 648 South 21st Street, and it was actually 748 South 21st Street."). That error was inadvertent and legally insignificant. *See United States v. Johnson*, 690 F.2d 60, 65 n.3 (3d Cir. 1982). In any event, the detectives on the scene relied on the facial validity of the

4

Police soon carried out the search warrant. During the search, they recovered approximately five pounds of marijuana[2] and 310 grams of cocaine, as well as "two blenders[,] [f]ive cellular phones, a money counter, a loaded 9 millimeter handgun [registered in Slone's name] . . . , .45

---

warrant in good faith. *See* App. 101 (Testimony of Detective Jason Paul) ("Q: Now did you believe the warrant was valid with the correct address at the time that it was signed by the judge? A: Yes.").

[2] On cross-examination, the Government's forensic scientist and drug identification expert testified that laboratory tests of the marijuana "did not test for tetrahydrocannabinol [THC] content, and therefore did not distinguish between marijuana and hemp." Gov't Br. 12 (citing App. 714–15, 720–21). However, Slone gave essentially unrebutted testimony of Carey's extensive marijuana trafficking. Moreover, the Government's expert in narcotics and drug trafficking explained that a high-level drug dealer like Carey would not "be involved in hemp use or distribution" because hemp has a negligible psychoactive effect and hence has no role in an illicit drug dealer's portfolio. App. 925. Thus, ample evidence contradicts Carey's claim that the marijuana seized from his residence could have been hemp. *See Griffin v. Spratt,* 969 F.2d 16, 22 n.2 (3d Cir. 1992) (citing *United States v. Schrock*, 855 F.2d 327, 334 (6th Cir. 1988)).

Separately, we reject Carey's contention that the District Court erred by limiting cross-examination on marijuana's legal status in Pennsylvania. As the Government correctly notes, "recent changes in *state* marijuana laws and *state* definitions . . . [have] no bearing on the applicable federal standards. . . ." Gov't Br. 48 (emphases in original).

caliber ammunition[,] a holster, two sifters . . . , [f]our digital scales, [a] considerable amount of cutting agent, baking soda, . . . confectionary sugar, baggies, a kilo press . . . , and measuring spoons." App. 216.

In the days following the search, Carey called Slone from jail on a recorded line to catalogue the recovered evidence and to admonish her for failing to destroy or hide what was found by police during the search. He also instructed her to collect drug debts on his behalf.

Law enforcement suspected Slone's involvement in Carey's criminal enterprise, so they met with her to discuss a cooperation agreement that would resolve potential charges that might be brought against her. Slone initially rejected the overture. But once the Government superseded its indictment of Carey to add Slone as a codefendant, she began cooperating.[3]

Carey filed several motions to suppress the evidence recovered from his vehicle and residence on April 6, 2018. The

---

[3] The records of these interactions "were provided to Carey [by the Government] and used by [him] at trial to cross-examine Slone and make closing arguments." Gov't Br. 45 (citing App. 772–75, 824–28, 837, 842–43, 846–54). Carey argues that the Government withheld notes and recordings of an earlier meeting with Slone during which it solicited information from her. But "no such notes or recordings exist because no preindictment proffer or interview was conducted." Gov't Br. 45. The District Court noted that Carey's suggestion that the Government violated its constitutional disclosure obligations was "without merit," Dist. Ct. Dkt. No. 264, at 1, and we agree.

Court held suppression hearings and heard testimony. Ultimately, it suppressed the photographs taken at Carey's residence by the investigator before the issuance of the search warrant but denied his suppression motions in all other respects.

The grand jury issued its final superseding indictment on March 31, 2021. It alleged that "[o]n or about April 6, 2018, in Dauphin County, within the Middle District of Pennsylvania," Carey (1) possessed with intent to distribute 500 grams or more of cocaine hydrochloride, in violation of 21 U.S.C. § 841(a), and (2) possessed with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a). Dist. Ct. Dkt. No. 178. It further charged that on or about April 6, 2018, in Dauphin County "and elsewhere," Carey (3) possessed a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c), and (4) conspired to possess with intent to distribute marijuana and 500 grams or more of cocaine hydrochloride, in violation of 21 U.S.C. § 846. *Id.* Carey pleaded not guilty and proceeded to trial.

At trial, Slone testified against Carey.[4] Among other things, she: detailed Carey's drug-trafficking operation; gave a first-hand account of Carey cooking powder cocaine and cutting cocaine freebase with Benzocaine; admitted to making straw purchases of cutting agents for Carey; outlined the methods Carey used to evade detection; recollected at least six large-scale cocaine deals in Lancaster and Philadelphia during

---

[4] Carey argues that Slone committed perjury at trial and that the Government withheld exculpatory evidence from its prior interviews with her. Our review of the record reveals no clear error in the District Court's refusal to credit these contentions.

7

which Carey purchased significant quantities of the drug packaged in 220–250-gram "flat cardboard, rectangular [boxes], with tape wrapped around [them],"[5] App. 730; testified that Carey was traveling to Lancaster to purchase additional cocaine or settle a prior cocaine debt at the time of his arrest—and that the $79,320 recovered by police from the trunk of the rental car was to be used for that purpose; and admitted that Carey, after being arrested, solicited her help in recovering some of his drug debts.

Regarding the gun and ammunition police recovered during the search of Carey's residence, Slone testified that Carey paid for their purchase. She noted that the gun was kept loaded on the nightstand next to where the couple slept—and that it was otherwise "always out." App. 836–37. Her testimony implied that Carey loaded the gun because she did not know how to do it herself. According to Slone, Carey instructed her to bring the gun to drug transactions for protection. Slone admitted to using a holster to carry the gun that was different from the holster police found during their search of Carey's residence.

The jury also heard testimony from Pennsylvania State Trooper Shawn Wolfe, an expert investigator of drug trafficking. He noted that the drugs and the paraphernalia recovered by police—the press, cutting agents, grinders, sifters, strainers, baking soda, and measuring cups—evidenced large-scale drug distribution.

---

[5] The cardboard box recovered in Carey's house on April 6, 2018, weighed 222 grams. Carey understood these boxes to contain, on average, 250 grams of cocaine.

8

On April 22, 2021, the jury convicted Carey on all counts. Following his conviction, the probation office conducted a presentence investigation and issued a presentence report (PSR). Based on the PSR and the parties' arguments at Carey's sentencing hearing, the District Court concluded that the testimony given by Slone and Wolfe, combined with other direct and circumstantial evidence, provided a sufficient evidentiary basis to estimate Carey's drug weight as a Level 30, per U.S.S.G. § 2D1.1. The District Court based its calculation on the following facts:

- ➢ Police seized 310 grams of cocaine from the residence during their search on April 6, 2018.
- ➢ Slone flushed an estimated 112 grams of cocaine down the toilet before the search that day.
- ➢ The money recovered from the crashed rental car was intended to purchase or settle a debt for at least two kilograms of the drug.
- ➢ The $92,700 recorded on an "owe sheet" recovered from Carey's residence reflected the sale of at least two kilograms of cocaine.
- ➢ Carey, accompanied by Slone, participated in at least six cocaine deals in Lancaster and Philadelphia, each involving roughly five 220- to 250-gram boxes of cocaine. In total, Carey purchased between 6 and 7.5 kilograms of cocaine during these transactions.[6]

---

[6] Based on this evidence, we reject Carey's contention that the District Court miscalculated the drug quantities involved for sentencing purposes. Even if the Court was wrong to assume

9

After assessing several other enhancements,[7] the District Court assigned Carey a Total Offense Level of 34 and a criminal history category of III. It sentenced Carey to 228 months in prison, consisting of 168 months on Counts I and IV and 120 months on Count II to run concurrently with each other, followed by a mandatory 60-month consecutive term of imprisonment for Carey's § 924(c) violation.

---

that the owe sheet detailed cocaine transactions only, that error did not affect Carey's base offense level and is therefore harmless. *See United States v. Diaz*, 951 F.3d 148, 159 (3d Cir. 2020) ("If a district court makes an error in its drug quantity determination that does not affect the base offense level . . . , the error is harmless.").

[7] Relevant to this appeal, the Court applied a two-level enhancement per U.S.S.G. § 3B1.1(c) based on evidence that Carey led, organized, or supervised drug-trafficking activity. That enhancement was proper, as Carey instructed Slone regarding the collection of drug money and other narcotics-related activities following his arrest.

In addition, the Court enhanced Carey's sentence because he willingly allowed Slone to participate in his drug-trafficking enterprise while she was pregnant, per U.S.S.G. § 2D1.1(b)(16)(B)(iii). Again, the record supports this enhancement. *See* PSR Addendum at ¶ 3 (Carey telling his supervising probation officer that "I have [] two boys on the way" several weeks before his arrest—which occurred when Slone was around six months pregnant).

Because we identify no misconduct or reversible error beyond that noted in Section II, we also reject Carey's claim of cumulative error.

Carey filed a timely notice of appeal.[8]

II.

We begin with Carey's challenge to Count I. To convict him for possession with intent to distribute 500 grams or more of cocaine hydrochloride in violation of 21 U.S.C. § 841(a), the Government had to prove that he possessed 500 grams or more of that substance on or about April 6, 2018, in Dauphin County. Carey contends that even if the record is viewed in the light most favorable to the Government, no rational trier of fact could have made that finding. *See United States v. Rowe*, 919 F.3d 752, 758–59, 761 (3d Cir. 2019). We agree.

Only 310 grams of cocaine were seized from Carey's residence on April 6, 2018. The Government attempts to add up the remaining 190 grams in three ways.

First, it points to the two lime-sized bags of cocaine Slone flushed down the toilet before the search on April 6, 2018. Though the Government's narcotics expert estimated that these bags, together, conservatively contained only 112 grams of cocaine, he also suggested that they might have weighed up to 200 grams if "recompressed into a powder form with a press . . . ." App. 924 (Expert testimony). On appeal, the Government implies that the expert's latter remark can sustain Count I.

---

[8] The District Court had subject-matter jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

11

The Government's position on appeal differs from its approach at trial, which took as granted the expert's conservative estimate. *See* App. 1028 (Gov't Closing Argument) ("[W]e're just going to add what the expert said as the lowest amount, which would be 112 grams."). The Government's trial approach tracked the evidence: the kilo press police recovered during the search of Carey's residence was only suitable for "pressing 125 to 250 grams of cocaine," App. 1019, a weight range exceeding the highest estimate of the flushed bags.

The Government's trial approach gave Carey no reason to elicit testimony from Slone on whether the bags she flushed contained loose powder or "recompressed" cocaine. *See* App. 1049 (Defense Closing Argument) ("We don't know what allegedly was flushed . . . . But when she held up her fingers and demonstrated, if [each bag] is 56 grams, it's still less than 500."). Principles of forfeiture and fairness thus preclude the Government from now relying on the expert's higher estimate. *See, e.g.*, *United States v. D'Amato*, 722 F. Supp. 221, 225 (E.D. Pa. 1989) (discussing *United States v. Minarik*, 875 F.2d 1186, 1189 (6th Cir. 1989)) ("Notably, the government shifted its position concerning . . . allegations central to its case . . . . As the district court noted when it granted judgment notwithstanding the verdict, the government's changing theories 'presented defendants with a moving target as they attempted to prepare a defense.'").

Second, the Government casts aspersions, urging us to condemn Carey just because he is a drug dealer. *See* Gov't Br. 42–43. The District Court appears to have accepted this argument. *See* App. 1347 (Op. at 16) ("The government's expert further testified that an individual operating at the scale

12

of Carey . . . would be operating well in excess of 500 grams at one time."). But while Carey's drug dealing "might be a basis for speculation" that he possessed 500 grams of cocaine on or about April 6, 2018, "it is not proof beyond a reasonable doubt." *Rowe*, 919 F.3d at 761. That Carey is generally "blameworthy" does not authorize his conviction for a specific crime absent sufficient proof. *United States v. Salamanca*, 990 F.2d 629, 638 (D.C. Cir. 1993).

Finally, the Government falls back on prior instances of alleged possession to add up to 500 grams. *See, e.g.*, Gov't Br. 41–42 ("Slone also testified she *previously* saw Carey with multiple cardboard boxes of cocaine *on different occasions—* up to 5 at any one time . . . . Slone further testified that she would accompany Carey to Philadelphia and Lancaster where Carey *regularly* purchased multiple boxes of cocaine from his supplier. *One of those cardboard boxes* was found in Carey's house on April 6, 2018, weighing 222 grams.") (emphases added). This line of reasoning implies that the variance between Count I's indictment charge and the Government's proof of prior possessions at trial is a permissible basis to convict Carey.[9] We disagree.

---

[9] By attacking the sufficiency of the evidence on Count I, Carey preserved a challenge to an improper variance. *See United States v. Miller*, 527 F.3d 54, 69–70 (3d Cir. 2008) (reviewing a sufficiency-of-the-evidence challenge to determine whether there was an impermissible variance); *United States v. Kemp*, 500 F.3d 257, 287 n.18 (3d Cir. 2007) (recognizing that a "pure sufficiency of the evidence challenge" may be interpreted as a claim "alleging a prejudicial variance").

13

The indictment charged that Carey possessed 500 grams or more of cocaine "[o]n or about April 6, 2018, in Dauphin County." Dist. Ct. Dkt. No. 178. By contrast, the Government put on evidence at trial showing that Carey possessed 500 grams or more of cocaine in Lancaster and Philadelphia in October and November 2017. This trial evidence "materially differ[ed] from [the facts] alleged in the indictment," *United States v. Daraio*, 445 F.3d 253, 259 (3d Cir. 2006), such that the latter did not "sufficiently inform[] [Carey] of the charges against him and allow[] him to prepare his defense without being misled or surprised at trial." *United States v. Vosburgh*, 602 F.3d 512, 532 (3d Cir. 2010). "Even when time is not an element of the charged offense, it nonetheless carries part of an indictment's notice load." *United States v. Cochran*, 697 F.2d 600, 604 (5th Cir. 1983). And here, the indictment put Carey on notice only that the Government planned to prove he possessed 500 grams or more of cocaine in Dauphin County reasonably near April 6, 2018. *See Real v. Shannon*, 600 F.3d 302, 308 (3d Cir. 2010). To uphold Carey's conviction based on possessions occurring five to six months prior to that date in a different county would be prejudicial to Carey and would place him at risk of double jeopardy. *Cf. United States v. Bastian*, 770 F.3d 212, 220 (2d Cir. 2014); *United States v. Johnson*, 409 F. App'x 688, 690 n.1 (4th Cir. 2011). We therefore vacate Carey's Count I conviction insofar as the Government argues for a permissible variance. *See United States v. Schoenhut*, 576 F.2d 1010, 1021–22 (3d Cir. 1978) (recognizing a defendant's right to an indictment that sufficiently informs him of the charges being brought).

III.

Turning to Carey's sufficiency-of-the-evidence challenge to his § 924(c) conviction, he contends that the Government "failed to present evidence linking [him] to [a] firearm" or "to a drug-related offence [sic] on or about the relevant time period." Opening Br. 76. We are unconvinced.

At trial, the Government presented three alternative theories of § 924(c) liability: (1) that Carey constructively possessed the gun in furtherance of his marijuana and cocaine dealing;[10] (2) that he aided and abetted Slone's possession of the gun in furtherance of the same, and; (3) that he was responsible for Slone's possession of the gun because it furthered the object of their drug trafficking conspiracy, *see United States v. Lopez*, 271 F.3d 472, 480 (3d Cir. 2001) (citing *Pinkerton v. United States*, 328 U.S. 640, 647–48 (1946)). Each of these theories is legally valid and constitutional, so we allow a general verdict on Count III to stand if sufficient

---

[10] There is ample evidence of this drug dealing, which serves as the predicate for Carey's § 924(c) charge. Law enforcement's seizure of five pounds of marijuana from Carey's residence supports his § 841(a) conviction in Count II. And Carey's "owe sheet" and Slone's testimony about his cocaine dealings in Lancaster and Philadelphia demonstrate his participation in an ongoing drug-trafficking conspiracy in violation of § 846, per Count IV. Unlike § 841(a), a § 846 conspiracy is a continuing offense that may be proved by aggregating weights from multiple distributions and discontinuous possessions. *See United States v. Williams*, 974 F.3d 320, 364 (3d Cir. 2020) (citing *United States v. Gori*, 324 F.3d 234, 237 (3d Cir. 2003)).

evidence supports a conviction under any of them.[11] *United States v. Tyler*, 732 F.3d 241, 253 (3d Cir. 2013) (citing *United States v. Syme*, 276 F.3d 131, 144 (3d Cir. 2002)).

We need not look further than the Government's first theory of liability, constructive possession.[12] The record shows that the recovered gun was kept near Carey's bed, close to his drugs and drug-trafficking paraphernalia; that the gun, when seized, was loaded even though Slone testified she did not know how to load it; that Slone did not know the make or model of the gun, even though it was registered in her name;

[11] Contrary to Carey's suggestion, none of the Government's alternative theories of possession constructively amended the indictment. *See United States v. Ashley*, 606 F.3d 135, 143 (4th Cir. 2010) ("It is settled that vicarious liability predicated on having aided or abetted the crimes of another need not be charged in an indictment. . . . These same principles hold true in the case of vicarious coconspirator liability.").

[12] Carey was in constructive possession of the gun if he "knowingly ha[d] both the power and the intention at a given time to exercise dominion or control over it, either directly or through another person or persons." *United States v. Cunningham*, 517 F.3d 175, 178 (3d Cir. 2008) (quoting *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992)). Proof of constructive possession may be "by either direct or circumstantial evidence, and it need not be exclusive to a single person." *United States v. Walker*, 657 F.3d 160, 172 (3d Cir. 2011) (citing *United States v. Iglesias*, 535 F.3d 150, 156 (3d Cir. 2008)); *see also United States v. Sparrow*, 371 F.3d 851, 853 (3d Cir. 2004) ("[I]mmediate accessibility [of the gun] at the time of search or arrest is not a legal requirement for a § 924(c) conviction.").

that Carey paid for the gun and bullets; and that police recovered a holster for the gun during their search of Carey's residence that did not belong to Slone. All this substantiates the Government's theory that Slone was Carey's porter. *See, e.g.*, *United States v. Walker*, 657 F.3d 160, 174 (3d Cir. 2011). And it supports the inference "that possession of the firearm advanced or helped forward [Carey's] drug trafficking." *United States v. Sparrow*, 371 F.3d 851, 853 (3d Cir. 2004).

Because there is sufficient evidence that Carey constructively possessed the firearm seized from his residence in furtherance of his drug trafficking, we uphold his conviction under Count III.

## IV.

Carey also raises a host of challenges to the District Court's suppression rulings. We review them for clear error as to the underlying factual findings and review anew the Court's application of the law to those facts. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002). His challenges do not persuade us.

## A.

The Court correctly allowed for the introduction of evidence seized from Carey's vehicle.

As noted, U.S. Marshals—after viewing Carey leave his residence and place a bag in the trunk of his rental car—moved to arrest him as he drove away. Carey, trying to evade arrest, crashed his car. The Marshals then completed the arrest and conducted a warrantless sweep of the vehicle. During that

sweep, they encountered a shoebox in the trunk that "had a big opening where you could put your thumb in . . . ." App. 541. Through that thumb hole, they observed large amounts of U.S. currency. The Marshals called Harrisburg Police, and the shoebox was opened, revealing approximately $80,000 in cash.

Suppression of cash was rightly denied. Detectives of the Harrisburg Police testified that it was standard procedure to perform an inventory search of any vehicle that was to be towed or impounded following an accident or arrest. *See* Harrisburg Bureau of Police General Order # 07-47 (Aug. 10, 2007); *see also* App. 100 (testimony about the policy); App. 235 (same); App. 244 (same). Such a procedure complies with the Fourth Amendment. *See Colorado v. Bertine*, 479 U.S. 367, 371–72 (1987). And because Carey's crashed vehicle was subject to the policy, the inevitable discovery doctrine applies.[13] *See United States v. Stabile*, 633 F.3d 219, 245 (3d Cir. 2011) (citing *Nix v. Williams*, 467 U.S. 431 (1984)). In other words, because the District Court correctly determined

---

[13] Carey's car "constitute[d] a hazard or obstruction to the flow of traffic." General Order 07-47 III.D.2. It was disabled from an accident, Carey was arrested, and no one was immediately available to take custody of it. *See* General Order 07-47 II.A.7, 12; *id.* at III.G–H. City policy thus authorized Harrisburg Police to impound and inventory Carey's vehicle and to search the closed containers in it. *See United States v. Salmon*, 944 F.2d 1106, 1120–21 (3d Cir. 1991), *abrogated on other grounds by United States v. Caraballo-Rodriguez*, 726 F.3d 418 (3d Cir. 2013). We can readily distinguish this case from *United States v. Vasey*, where impoundment was an option of "last resort" to which the defendant objected contemporaneously. 834 F.2d 782, 790 n.4 (9th Cir. 1987).

by a preponderance of the evidence that the Harrisburg Police, using routine procedures, inevitably would have discovered the box of cash in the trunk of Carey's crashed rental car, that evidence is admissible. *See, e.g.*, *United States v. Bullette*, 854 F.3d 261, 266–67 (4th Cir. 2017).

B.

Nor did the District Court err in denying suppression of the items seized from Carey's residence. After Carey crashed his rental car, police went to his residence and spoke with Slone inside the property threshold during a lawful "knock and talk." *See Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018). The officers' entry into the home was not a pretext "to search for and seize an object without a warrant." *Contra* Opening Br. 39 (quoting *Payton v. New York*, 445 U.S. 573, 581 (1980)). Rather, it was to speak with Slone, Carey's girlfriend, regarding his suspected criminal activity. When Slone confirmed Carey's drug dealing and acknowledged that marijuana and a firearm were in the home, she gave police probable cause to obtain a search warrant for the residence. At this point, the cash seized from Carey's car was "extra icing on a cake already frosted." *Van Buren v. United States*, 141 S. Ct. 1648, 1661 (2021) (quoting *Yates v. United States*, 574 U.S. 528, 557 (2015) (Kagan, J., dissenting)).

Slone's voluntary statements to police during the "knock and talk" also provided "good reason to fear that, unless restrained, [she] would destroy the drugs before they could return with a warrant." *Illinois v. McArthur*, 531 U.S. 326, 332 (2001). The police thus acted consistent with the Fourth Amendment when securing the premises and escorting Slone to obtain her shoes when she asked to leave.

Finally, the minor typographical error in the warrant noted above does not undermine the officers' good-faith reliance on it. And the premature photographs taken of the interior of Carey's residence before the warrant's issuance were not used to secure the warrant, so their suppression does not unsettle its legal validity. The District Court thus properly admitted all the evidence seized from Carey's residence during execution of the search warrant.

* * *

We affirm in part, vacate in part, and remand to the District Court for a resentencing consistent with this opinion.

20