PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-1591
_____

MICHAEL SAUERS, Individually and as Administrator
of the Estate of Carola R. Sauers, deceased

v.

BOROUGH OF NESQUEHONING;
CHIEF OF POLICE SEAN SMITH;
OFFICER STEPHEN HOMANKO

Officer Stephen Homanko,
Appellant
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-16-cv-00811)
District Judge:  Hon. James M. Munley
_____

Argued
June 4, 2018

Before:   AMBRO, JORDAN, and VANASKIE, *Circuit Judges*

(Opinion Filed: October 2, 2018)

_____

Joshua M. Autry   [ARGUED]
Frank J. Lavery, Jr.
Lavery Faherty Patterson
225 Market Street
Suite 304, P.O. Box 1245
Harrisburg, PA   17108
        *Counsel for Appellant*

Michael B. Kaspszyk   [ARGUED]
Merwine Hanyon & Kaspszyk
2642 Route 940
Pocono Summit, PA   18346
        *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

JORDAN, *Circuit Judge*.

This case arises out of a tragic car accident that injured Michael Sauers and killed his wife.  The crash resulted from the criminally reckless driving of police officer Stephen Homanko.  Sauers later brought this suit against Homanko and others pursuant to 42 U.S.C. § 1983 and state law for, among other things, violating his and his wife's Fourteenth Amendment substantive due process rights.  Homanko moved

2

to dismiss the § 1983 claim for failure to state a claim and, in the alternative, he sought qualified immunity. The District Court denied the motion and Homanko appealed. Because we conclude that it was not clearly established at the time of the crash that Homanko's conduct, as alleged in the complaint, could give rise to constitutional liability under the Fourteenth Amendment, we will vacate the District Court's denial of qualified immunity. We hope, however, to establish the law clearly now.

## I.    Background[1]

On May 12, 2014, Sauers and his wife were driving southbound on Route 209 in the Borough of Nesquehoning, Pennsylvania. At the same time, Homanko was on patrol on Route 209 and traveling in the same direction when he observed the driver of a yellow Dodge Neon commit a summary traffic offense in the northbound lane. Based on that observation alone, he turned around and began to pursue the Dodge. At some point he took the time to radio ahead to the police in the neighboring borough to request that officers there pull the Dodge over when it reached their jurisdiction.[2]

---

[1]    When reviewing an appeal from a district court's ruling on a motion to dismiss, we accept allegations in the complaint as true and draw all plausible inferences from those allegations in favor of the plaintiff. *Kedra v. Schroeter*, 876 F.3d 424, 432, 434 (3d Cir. 2017).

[2]    When the car arrived in the neighboring jurisdiction, the officers stopped it as requested but did not charge the driver with a traffic violation or any other crime.

3

Homanko then decided that catching the Dodge himself was important enough to warrant a chase at speeds of over 100 miles-per-hour. Several members of the public observed him driving recklessly. During the pursuit, Homanko lost control of his police car while going around a curve. His car began to spin, crossed the center line into southbound traffic, and crashed into Sauers's car. The accident seriously injured Sauers and killed his wife. Homanko was subsequently charged and pled guilty to vehicular homicide, which requires proof beyond a reasonable doubt of reckless or grossly negligent driving, and reckless endangerment.[3]

The criminal case was not the end of Homanko's legal trouble. Sauers – individually and as the administrator of his wife's estate – initiated the present lawsuit against him, setting forth federal and state law causes of action, including a claim under § 1983.[4] Sauers premised his § 1983 claim on a "state-created danger" theory of liability. Homanko moved

---

[3] As recounted in his briefing, Homanko additionally pled guilty to a number of minor traffic offenses.

[4] Sauers also sued the Borough of Nesquehoning and the Nesquehoning Police Chief. Those parties filed a motion to dismiss the complaint, separately from Homanko. The District Court granted the motion as to the police chief and granted it in part and denied it in part as to the Borough. Those rulings have not been appealed. Accordingly, this appeal addresses only the District Court's denial of Homanko's request for qualified immunity.

to dismiss only that claim. He argued that the complaint did not plausibly allege a state-created danger claim and, in the alternative, that he was entitled to qualified immunity because it was not clearly established in May 2014 that negligent or reckless police driving could give rise to a constitutional cause of action. The District Court denied Homanko's motion as to both liability and qualified immunity.

As to liability, the Court determined that the complaint adequately pled a state-created danger claim, a determination that Homanko does not now appeal. The Court further concluded that the law was clearly established in May 2014 that "any reasonable officer would have known that pursuing a potential traffic offender in excess of 100 miles-per-hour under the[] circumstances [alleged in the complaint] gives rise to a state-created danger claim." (App. at 21.) That determination is the subject of this appeal.

## II.    Discussion[5]

Qualified immunity protects government officials from civil damages for conduct that "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (citation omitted). Thus, courts

---

[5] The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. We have jurisdiction pursuant to 28 U.S.C. § 1291 over interlocutory appeals raising a purely legal challenge to a denial of qualified immunity. *Mirabella v. Villard*, 853 F.3d 641, 648 (3d Cir. 2017). Because this appeal raises only a question of law, we have jurisdiction and our review is plenary. *Id.*

assessing a claim of qualified immunity must answer two questions. One is whether the defendant's conduct violated a statutory or constitutional right. The other is whether the right at issue was clearly established when the conduct took place. We have discretion to address either inquiry first. *Id.* at 236.

In its recent decisions addressing qualified immunity, the Supreme Court has "repeatedly told courts … not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (citation omitted). The question in this case therefore cannot be framed simply in terms of recklessness generally. Homanko's request for qualified immunity must be assessed within the context of the case law that has developed from accidents caused by high-speed police pursuits that injure third parties.

### A. Sauers's Complaint Pleads a Plausible State-Created Danger Claim.

Homanko has not appealed the District Court's determination that the complaint adequately describes a constitutional violation, and for good reason. The pleadings describe a police officer driving at speeds over 100 miles-per-hour on a two-way, undivided road to catch someone who had committed a minor traffic infraction. There was no emergency at all, and Homanko likely did the most that was warranted when he radioed the police in a neighboring jurisdiction to stop the offender. His hyper-aggressive decision to chase the Dodge cannot be justified. Nonetheless, to determine whether his conduct violated a clearly

6

established constitutional right, we must take the time to define that right and explain why the conduct violated it.

Defining a right at the appropriate level of specificity is often the most critical aspect of a qualified immunity analysis. In undertaking that task, we are guided by the Supreme Court's repeated instructions to do so in light of the particular facts of the case at hand. *See Kisela*, 138 S. Ct. at 1152; *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). We accordingly define the right at issue here as one not to be injured or killed as a result of a police officer's reckless pursuit of an individual suspected of a summary traffic offense when there is no pending emergency and when the suspect is not actively fleeing the police.

As earlier noted, Sauers's complaint relies on the state-created danger theory of liability to establish his right to be free from what Homanko did. That doctrine embodies the principle that the government has an obligation under the Fourteenth Amendment's Due Process Clause "to protect individuals against dangers that the government itself creates." *Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018). Establishing a claim under that doctrine requires a plaintiff to plead four elements:

> (1) [t]he harm ultimately caused was foreseeable and fairly direct;
>
> (2) a state actor acted with a degree of culpability that shocks the conscience;

7

(3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Id.* at 176-77 (citation omitted). It is clear, we think, that the complaint adequately alleges elements one, three, and four. Whether Homanko's alleged conduct shocks the conscience is a closer call.

The level of culpability required "to shock the contemporary conscience" falls along a spectrum dictated by the circumstances of each case. *County of Sacramento v. Lewis*, 523 U.S. 833, 847-49 & n.8 (1998). Our case law establishes three distinct categories of culpability depending on how much time a police officer has to make a decision. *Haberle*, 885 F.3d at 177. In one category are actions taken in a "hyperpressurized environment[.]" *Id.* (citation omitted). They will not be held to shock the conscience unless the officer has "an intent to cause harm." *Id.* (citation omitted). Next are actions taken within a time frame that allows an officer to engage in "hurried deliberation." *Id.* (citation omitted). When those actions "reveal a conscious disregard of a great risk of serious harm" they will be sufficient to

8

shock the conscience.[6]  *Id.* (quotation marks and citation omitted).  Finally, actions undertaken with "unhurried judgments," with time for "careful deliberation," will be held to shock the conscience if they are "done with deliberate indifference."  *Id.* (citation omitted).  Our case law is clear that this "shocks the conscience" framework for analysis applies to police-pursuit cases.  *Brown v. Pa. Dep't of Health & Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 480 (3d Cir. 2003); *cf. Kedra v. Schroeter*, 876 F.3d 424, 432, 448 (3d Cir. 2017) (relying on pre-2014 case law to conclude that the state-created danger doctrine was a clearly established theory of liability in September 2014).

The District Court rightly interpreted the complaint to allege that Homanko "had at least some time to deliberate" before deciding whether and how to pursue the traffic offender.  (App. at 16.)  That places the fact-pattern in the second category of culpability, requiring inferences or allegations of a conscious disregard of a great risk of serious harm.  That conclusion is supported by the allegation that

---

[6] The District Court identified "gross negligence or arbitrariness" as the level of culpability required to shock the conscience when an officer has time only for hurried deliberation.  (App. at 11-12.)  We have described the "gross negligence or arbitrariness" standard, however, as one "that provides little guidance." *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006).  We have been clear in recent years that the level of culpability required to shock the conscience when an officer has time for hurried deliberation is "a conscious disregard of 'a great risk of serious harm[.]'" *Haberle*, 885 F.3d at 177 (quoting *Sanford*, 456 F.3d at 310); *accord Kedra*, 876 F.3d at 437.

9

Homanko, at some point, had time to call the neighboring police department as he was contemplating his actions. It is further supported by an obvious inference from the nature of the Dodge driver's mild provocation: there was no emergency arising from a simple traffic violation. The liability question thus becomes whether deciding to pursue a potential summary traffic offender at speeds of over 100 miles-per-hour, after radioing for assistance from the neighboring jurisdiction where the potential offender was headed, demonstrates a conscious disregard of a great risk of serious harm. We have no difficulty in concluding that it does.

Engaging in a high-speed pursuit on public roadways at speeds of over 100 miles-per-hour threatens "all those within … range [of the pursuit], be they suspects, their passengers, other drivers, or bystanders." *Lewis*, 523 U.S. at 853. Every police officer understands that risk. That is why we expect our law enforcement personnel to engage in such pursuits only when "reasonable justification" exists. *Id.* at 846. Responding to a true emergency may be a reasonable justification. Pursuing an actively fleeing suspect who is endangering the public welfare may also be a reasonable justification. But attempting to catch someone who has committed a minor traffic offense, especially when other law enforcement officials have been alerted to stop the offender, is not a reasonable justification for driving "careless[ly]" and at "speed[s] in excess of 100 mph." (App. at 31-32.) Homanko did not have to make a split-second decision "in haste" and "under pressure." *Lewis*, 523 U.S. at 853 (citation omitted). He could have let the officers in the neighboring jurisdiction handle the routine traffic stop as, in fact, they did.

Instead, he chose to engage in a reckless and unjustifiable pursuit, with tragic consequences.

In sum, Sauers adequately pled that Homanko's conduct was conscience-shocking under our state-created danger framework. The complaint therefore contains a plausible claim that Homanko violated Sauers's and his wife's Fourteenth Amendment substantive due process rights.

## B. The Right at Issue Was Not Clearly Established In May 2014.

The existence of a substantive due process claim having been established, we now turn to the central issue of this appeal, namely whether Homanko had fair warning that he could be subject to constitutional liability for actions taken in conscious disregard of a great risk of harm during the course of a police pursuit. We conclude that he did not. At the time of the crash in May 2014, the state of the law was such that police officers may have understood they could be exposed to constitutional liability for actions taken during a police pursuit only when they had an intent to harm. Thus, it was not at that time clearly established that Homanko's actions could violate the substantive due process rights of Sauers and his wife.

A right is clearly established when the law is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks, citation, and alteration omitted). That does not require a prior precedent with indistinguishable facts, "but existing precedent must have placed the statutory or constitutional

11

question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Existing precedent is sufficient to place a constitutional question beyond debate and to defeat qualified immunity only if it is "controlling authority in [the relevant] jurisdiction," *Wilson v. Layne*, 526 U.S. 603, 617 (1999), or if "a 'robust consensus of cases of persuasive authority' in the Court of Appeals" has settled the question, *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (quoting *Taylor v. Barkes*, 135 S. Ct. 2042, 2044 (2015)).

When qualified immunity is at issue, context matters. The "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). When courts fail to take into consideration the "particularized" facts of a case, they permit plaintiffs "to convert the rule of qualified immunity … into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *White*, 137 S. Ct. at 552 (alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 639-40 (1987)).

There is, moreover, an important distinction between assessing whether a plaintiff has pled a "clearly established theory of liability" and the question of whether that theory is fairly applied to a government official in light of the facts in a given case. *See Kedra*, 876 F.3d at 435 (explaining that a particular right is only clearly established when the state of the law gave the relevant official "fair warning that his actions were unconstitutional in the particular factual scenario he confronted" (internal quotation marks, citation, and editorial marks omitted)). It is only when both the theory of

liability and its application to the established facts are sufficiently plain that the legal question of liability is beyond legitimate debate and a plaintiff can defeat a qualified immunity defense. *Id.* at 435-36. In this instance, as discussed above, Sauers's complaint relies on the clearly established state-created danger theory of liability. The particular factual allegations, meanwhile, involve a police pursuit of a non-fleeing summary traffic offender.

Accordingly, to assess whether the right to be free of the risk associated with a non-emergency but reckless police pursuit was clearly established in May 2014, we must ask whether Supreme Court precedent, our own precedent, or a consensus of authority among the courts of appeals placed that right beyond debate. *See al-Kidd*, 563 U.S. at 741-42; *Kedra*, 876 F.3d at 450. Qualified immunity, after all, protects even those officials who exercise extraordinarily poor judgment. *al-Kidd*, 563 U.S. at 743. Law enforcement officials do not get stripped of qualified immunity every time a judge, with the clarity afforded by hindsight, believes that an official has committed a wrong. Otherwise, the very purpose of qualified immunity – to give law enforcement officials the benefit of all reasonable doubt in the exercise of their professional duties – would be undermined. If any uncertainty existed in the law in May 2014 as to whether reckless police driving could give rise to constitutional liability in circumstances such as those alleged here, then we must afford Homanko the protections of qualified immunity. Our survey of the relevant cases reveals that the law was not so clear as to be "beyond debate." *Id.* at 741.

An officer on patrol in May 2014 could have reasonably understood, based on prevailing law, that he could

13

pursue a potential traffic offender, even recklessly, without being subjected to constitutional liability. The Supreme Court, in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), had adopted an intent-to-harm standard in a police pursuit case involving a high-speed chase of dangerously fleeing suspects. *Id.* at 854. In the years between that decision and the events at issue here, the courts of appeals were inconsistent in whether to apply the intent-to-harm standard in police-pursuit cases only when an exigency necessitated a chase, or whether to apply that standard in all police-pursuit cases, regardless of any exigencies.

*Lewis* involved a police officer who was pursuing two suspects actively fleeing the police in a dangerous manner. *Id.* at 836. The suspects, riding together on a motorcycle, were weaving in and out of traffic at high speeds. *Id.* After the driver of the motorcycle lost control and crashed, the pursuing officer accidentally struck and killed one of the suspects. *Id.* at 837. The Court characterized the situation as involving an officer who had to make an "instantaneous" reaction to the fleeing suspects' "outrageous behavior[.]" *Id.* at 855. It held that, in such circumstances, a police pursuit will not give rise to a substantive due process violation absent a specific intent to harm. *Id.* at 854. In reaching that conclusion, the Court noted that conduct intended to cause harm was "most likely to rise to the conscience-shocking level" and that negligent conduct was never sufficient for a substantive due process claim. *Id.* at 849. It also explained, however, that conduct falling between intentional conduct and negligent conduct was "a matter for closer calls" that could, given the right circumstances, be actionable under the Fourteenth Amendment. *Id.*

14

*Lewis*, then, clearly established that an officer can be liable for a substantive due process violation resulting from a high-speed pursuit of a dangerously fleeing suspect only if the officer intended to cause harm. But it left open the possibility that a lower level of culpability could suffice in the right circumstances. In May 2014, the courts of appeals had not coalesced around what those circumstances might be in the police-pursuit context. The Tenth Circuit, in *Green v. Post*, addressed a police officer's request for qualified immunity in a case analogous to ours and explained that

> there are many permutations on the theme of police pursuits; while most involve high speeds, there are many variables, including whether the officer is responding to an emergency or not, whether he or she is directly pursuing a fleeing suspect or not, and, significantly under *Lewis* and cases interpreting it, whether the officer has time for actual deliberation.

574 F.3d 1294, 1309 (10th Cir. 2009).

In *Green*, an innocent driver was killed after a police officer crashed into the victim's car as the officer "was simply trying to catch up to [a] suspected violator of the law[.]" *Id.* at 1297. The suspect had allegedly filled his car up with approximately $30 worth of gas without paying for it. *Id.* at 1296. The crash occurred as the officer "was traveling straight through [an] intersection at a high rate of speed and without his vehicle's siren or lights on[.]" *Id.* The officer admitted "that he was not responding to an emergency situation" and that the suspect was not actively fleeing him. *Id.* at 1297.

15

The court identified the officer's actions as falling "in the middle range of the culpability spectrum" identified by *Lewis* – more than negligent but not quite intentional – that could potentially give rise to a substantive due process violation. *Id.* at 1302 (citation omitted). It thus applied the "deliberate indifference" standard when assessing the officer's conduct. *Id.* at 1302-03. Although it concluded that the conduct was not sufficiently conscience-shocking to violate the Fourteenth Amendment, the court nonetheless proceeded to analyze whether the law on police pursuits was clearly established. *Id.* at 1303-04.

It noted that at least two of our sister circuits – the Eighth and Ninth Circuits – have adopted an "intent to harm" standard for all police pursuit cases, whether or not an emergency existed at the time of pursuit. *Id.* at 1308-09 (citing *Bingue v. Prunchak*, 512 F.3d 1169, 1177 (9th Cir. 2008); *Helseth v. Burch*, 258 F.3d 867, 871 (8th Cir. 2001) (en banc)). The Ninth Circuit, for its part, held "that the *Lewis* standard of 'intent to harm' applies to all high-speed police chases," and it refused to "draw a distinction between 'emergency' and 'non-emergency' situations" involving an officer's attempt to apprehend a suspect.[7] *Bingue*, 512 F.3d at

_____

[7] Although the Ninth Circuit appears to have limited its application of *Lewis*'s intent-to-harm standard to "situations involving high-speed chases aimed at apprehending a fleeing suspect," any such limitation does not undermine that court's explicit refusal to distinguish between "'emergency' and 'non-emergency' situations." *Bingue*, 512 F.3d at 1177. It also leaves open the question of whether a suspect leaving the scene of a crime, who does not know that

16

1177. Similarly, the Eighth Circuit interpreted *Lewis* as meaning "that the intent-to-harm standard, rather than the deliberate indifference standard, applies to *all* high-speed police pursuits aimed at apprehending suspected offenders." *Helseth*, 258 F.3d at 871. After surveying the state of the law after *Lewis*, the Tenth Circuit concluded that "it was not clearly established [in June 2006] what specific standard [of culpability] applied to … [an] officer … engaged in a high-speed non-emergency response to a call to locate and arrest a suspected gas thief." *Id.* at 1304.

The Eighth Circuit has since reemphasized its interpretation of *Lewis*. In *Sitzes v. City of West Memphis*, it was faced with circumstances in which a police officer responded to a 911 report of a robbery in a Wal-Mart parking lot involving $55 and an alleged assault. 606 F.3d 461, 464 (8th Cir. 2010). Despite the fact that the crime was not reported to be ongoing, and that other officers were already en route to the scene, the defendant-officer decided to drive between 80 and 90 miles-per-hour on a 30 mile-per-hour two-way street without turning on his sirens or emergency lights. *Id.* In racing to the parking lot, the officer crossed over into opposing traffic, ultimately crashing into a bystander's car at an intersection and killing one of the occupants. *Id.* The court nevertheless upheld the application of an intent-to-harm standard because the defendant-officer had testified that he "subjectively" believed that he was responding to an emergency. *Id.* at 468. The court explained that that standard

the police are pursuing him, should be considered a "fleeing suspect." It is far from certain, therefore, what standard of culpability the Ninth Circuit would apply to the facts at issue here.

17

was appropriate even though the facts "might not qualify as an 'emergency' under" police department policies. *Id.* And, importantly, it held that it did "not 'reject intent-to-harm as the governing standard whenever a judge or a jury could say, with the wisdom of hindsight, that an officer engaged in a high-speed pursuit had ample time to deliberate.'" *Id.* (citation omitted). According to that court, "the amount of time [an officer has] to deliberate on his actions is not, by itself, sufficient to render the intent-to-harm standard inapplicable." *Id.*

Given those decisions by the Eighth, Ninth, and Tenth Circuits, we cannot conclude that case law by May of 2014 had clearly established that an officer's decision to engage in a high speed pursuit of a suspected traffic offender could, in the absence of an intent to harm, give rise to constitutional liability.[8] A police officer could have understood that, as

---

[8] Our own precedents do not provide any added clarity regarding the proper standard by which to judge whether an officer's conduct shocks the conscience in police pursuits that involve neither an emergency nor a fleeing suspect. Although we have indicated that the "shocks the conscience" standard applies to police pursuit cases, *see Brown*, 318 F.3d at 480 ("[T]he 'shocks the conscience' standard should apply in all substantive due process cases if the state actor had to act with urgency[, including] police pursuit cases[.]"), our cases do not give fair warning that, absent an intent to harm, police could face constitutional liability based on a high-speed pursuit, *see, e.g.*, *Davis v. Twp. of Hillside*, 190 F.3d 167, 171 (3d Cir. 1999) (applying *Lewis* intent to harm standard to injury of bystander who was injured as a result of a high-speed pursuit of a fleeing suspect).

18

long as he believed a pursuit was justified, constitutional liability would not follow based on recklessness alone.

Our dissenting colleague disagrees, concluding that it was obvious in May 2014 that Homanko's conduct violated the Constitution. Concur./Dissent at 9-10. To the dissent, it is of high importance that the Tenth Circuit in *Green* applied a deliberate difference standard to a police driving case that, as here, involved neither an emergency nor an actively fleeing suspect. But the dissent discounts the fact that no court of appeals (until now) has joined the Tenth Circuit in distinguishing between those police pursuit cases in which a true exigency exists and those in which less is at stake. As we have described above, at least two courts of appeals have explicitly questioned the sort of distinction drawn by the Tenth Circuit.[9]

We agree with the Tenth Circuit's application of a culpability standard below that of "intent to harm" in a non-emergency police pursuit case – indeed the entire panel here is in accord on that point. Where we part company with our dissenting colleague is at his rejection of the rest of the Tenth Circuit's decision. That court acknowledged that the law was not yet clearly established. We accept the accuracy of that assessment then and believe the law as of May 2014 still

---

[9] The dissent minimizes the import of *Bingue* and *Helseth* because those cases involved conduct differing from the conduct alleged here. But those differences do not alter those courts' explicit holdings that the intent-to-harm standard should apply to police pursuits whether or not the officer is responding to a pending emergency.

19

remained unsettled; our dissenting colleague disagrees. While he evidently views the legal conclusion about constitutional liability as obvious, we do not. Nor can we say that the Tenth Circuit's decision in *Green* alone amounts to the "'robust consensus of cases of persuasive authority' in the Court of Appeals" that we have held necessary to clearly establish a right in the absence of controlling precedent. *Mammaro*, 814 F.3d at 169 (quoting *Taylor*, 135 S. Ct. at 2044). That is especially so in light of the Eighth Circuit's post-*Green* decision in *Sitzes*.

The dissent also suggests that Homanko's guilty plea to vehicular homicide and reckless endangerment supports the conclusion that he violated a clearly established constitutional right. Concur./Dissent at 10 n.3. Assuming that a guilty plea to a state criminal statute is important in deciding whether the culpable conduct violated a clearly established right guaranteed by the United States Constitution, *see Kane v. Barger*, No. 17-3027, --- F.3d ---, 2018 WL 4000068, at *7 (3d Cir. Aug. 22, 2018) (suggesting, though not holding, that conduct meeting a state criminal statute is more likely to violate a clearly established constitutional right),[10] a

---

[10] We note that *Kane*'s ultimate rejection of qualified immunity rested on the fact that our own precedent contained factually and legally analogous case law to put the defendant "on notice that he acted unconstitutionally." *Kane*, 2018 WL 4000068, at *7. No such case law existed in our Circuit in May 2014 that would have given Homanko fair warning that he could be subject to constitutional liability for actions during a police pursuit that were not taken with an intent to harm.

conviction for reckless behavior does not help answer the issue in this appeal: namely, was the law settled in May 2014 that, absent a specific intent to harm, constitutional liability could be imposed on a police officer engaged in a police pursuit. We think it was not, and the sympathy we have for the victims of Officer Homanko's serious error does not change that.

Consequently, although Homanko's judgment was bad to the point of recklessness, he is entitled to qualified immunity on Sauers's § 1983 state-created danger claim.[11]

### C.     Establishing the Law in the Third Circuit.

Although the state of the law in May 2014 was unsettled as to whether police officers engaged in a police pursuit could be subject to constitutional liability for a level of culpability less than an intent to harm, our opinion today should resolve any ambiguity in that regard within this Circuit. Police officers now have fair warning that their conduct when engaged in a high-speed pursuit will be subject to the full body of our state-created danger case law. That law clearly establishes that the level of culpability required to shock the conscience exists on a spectrum tied to the amount of time a government official has to act. In the police pursuit context, it is also necessary to take into consideration the

---

[11]     We emphasize that our decision on qualified immunity does not mean that Homanko is immune from any suit arising from his conduct; he is only immune to a suit alleging the federal constitutional claims made here. He remains exposed to state law tort claims that can, and have been, brought against him, so Sauers is not without a remedy.

officer's justification for engaging in the pursuit. We recognize that most high-speed police pursuits arise when officers are responding to emergencies or when they must make split-second decisions to pursue fleeing suspects. Our holding today does nothing to alter the longstanding principle that, in such cases, constitutional liability cannot exist absent an intent to harm. But when there is no compelling justification for an officer to engage in a high-speed pursuit and an officer has time to consider whether to engage in such inherently risky behavior, constitutional liability can arise when the officer proceeds to operate his vehicle in a manner that demonstrates a conscious disregard of a great risk of serious harm.

## III. Conclusion

For the foregoing reasons, we will vacate the District Court's denial of Homanko's request for qualified immunity.

VANASKIE, *Circuit Judge*, concurring in part and dissenting in part.

I agree with my colleagues that under our state-created danger framework, the facts alleged by Appellee Michael Sauers readily establish that Officer Homanko's conduct was conscience-shocking. I also agree that, going forward, "[p]olice officers now have fair warning that their conduct when engaged in a high-speed pursuit will be subject to the full body of our state-created danger case law." Maj. Slip Op. at 15. I therefore join parts II.A and II.C of the majority's decision in full. However, because I believe that a reasonable officer in Homanko's position would have known on May 12, 2014, that the outrageous conduct alleged in this case was unconstitutional, I respectfully dissent from the majority's finding that Homanko is entitled to qualified immunity.

I.

Under the second prong of the qualified immunity analysis, we must ask "the objective (albeit fact-specific) question whether a reasonable officer could have believed [Homanko's conduct] to be lawful, in light of clearly established law and the information [he] possessed." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In undertaking this analysis, the "key issue" is whether a reasonable police officer in Homanko's position could have believed that driving a police cruiser at speeds in excess of 100 miles-per-hour to catch up to an unsuspecting motorist, who allegedly committed a minor traffic infraction, "comported with established legal standards" as they existed on the date of the accident. *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001) (citation omitted). Critically, "it need not be the case that the exact conduct has previously been held unlawful so long as the

'contours of the right' are sufficiently clear such that a 'general constitutional rule already identified in the decisional law' applies with 'obvious clarity'" to the established facts. *Kedra v. Schroeter*, 876 F.3d 424, 450 (3d Cir. 2017) (internal citations omitted) (quoting *Anderson*, 483 U.S. at 640; *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). This principle holds true "'even in novel factual circumstances,' because the relevant question is whether the state of the law at the time of the events gave the officer 'fair warning.'" *Id*. (quoting *Hope*, 536 U.S. at 741).

Here, I agree with the majority that, as of May 2014, it was "clear" that Homanko's conduct would be evaluated pursuant to our Court's sliding scale of culpability.[1] Maj. Slip Op. at 8. I also agree with the majority that our Court has "been clear in recent years that the level of culpability required to shock the conscience when an officer has time for hurried deliberation is a conscious disregard of a great risk of serious harm." *Id*. at 8 n.6 (alterations and citations omitted). And, like the majority, I too "have no difficulty in concluding" that an officer who exhibits deplorable judgment and "unjustifiabl[y]" pursues "a potential summary traffic offender at speeds of over 100 miles-per-hour, after radioing for assistance from the neighboring jurisdiction where the

---

[1] The Supreme Court in *County of Sacramento v. Lewis*, 523 U.S. 833 (1998), indicated that a sliding scale of culpable conduct applied to determine whether a law enforcement officer's actions were sufficiently conscienceshocking to impose liability, stating that the deliberate indifference "standard is sensibly employed only when actual deliberation is practical." *Id*. at 851. There is no dispute here that "actual deliberation" by Homanko was practical.

potential offender was headed, demonstrates a conscious disregard of a great risk of serious harm." *Id*. at 8-9. Applying these mutually held premises to the question of whether the Sauers' due process rights were clearly established on the date in question, it would appear, therefore, that the majority and I are in agreement that "the contours of the right are sufficiently clear[] such that a general constitutional rule already identified in the decisional law applies with obvious clarity" to the established facts. *Kedra*, 876 F.3d at 450 (internal citations omitted).

Yet despite our conspicuous agreements on the pertinent legal principles and their application to the facts at hand, the majority has concluded that Homanko is entitled to qualified immunity on the ground that the law was not "settled in May 2014 that, absent a specific intent to harm, constitutional liability could be imposed on a police officer engaged in a police pursuit.." Maj. Slip Op. at 20 (emphasis added). Justification for such a finding eludes me. To endorse the majority's conclusion, one must accept the proposition that on May 12, 2014, a reasonable police officer—fully informed of the legal principles recited above—would not have considered it conscience-shocking to (1) execute a U-turn into oncoming traffic for the sole purpose of catching a potential traffic offender, and then (2) proceed in breakneck fashion to pursue the unmindful offender at speeds over 100 miles-per-hour, all while being fully aware that there are officers ahead better positioned to execute a stop.

Our case law does not compel such an implausible conclusion. On the date in question here, a reasonable officer undertaking a non-emergency, high-speed pursuit would have known that in police pursuit cases brought under 42 U.S.C. § 1983, we assess whether an officer's conduct "shocks the

3

conscience" by gauging how much time the officer had to deliberate before deciding to give chase. Maj. Slip Op. at 8 (citing, *inter alia*, *Brown v. Pa. Dep't of Health & Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 480 (3d Cir. 2003)). Indeed, five years prior to the date in question, the Tenth Circuit held in *Green v. Post*, 574 F.3d 1294, 1302–03 (10th Cir. 2009), that *Lewis*'s intent-to-harm standard does not apply if—as here—an officer is not engaged in a hot pursuit of a fleeing suspect, but rather is engaged in a non-emergency, high-speed, unilateral pursuit of a suspected offender who is unaware that she is being chased. In such circumstances, the officer's conduct is evaluated under a "middle level [standard] of culpability" that looks to whether the officer acted with "conscious, deliberate indifference to an extreme risk of very serious harm to the plaintiff." *Id*. at 1303. The "middle level standard" applied in *Green* mirrors the "mid-level standard" that we formally adopted in *Sanford v. Stiles*, 456 F.3d 298, 307 (3d Cir. 2006), and that the majority applied here. *See* Maj. Slip Op. at 8 n.6.

In my view, qualified immunity should not be granted here simply because there is little case law imposing liability on a police officer who drives his cruiser at speeds in excess of 100 miles per hour in a non-emergency situation. Neither the Supreme Court nor our Court has ever adopted a liability-based litmus test for determining whether a right was clearly established on the date in question. *See Kedra*, 876 F.3d at 450 ("[I]t need not be the case that the exact conduct *has previously been held unlawful* so long as the 'contours of the right' are sufficiently clear. . . .") (quoting *Anderson*, 483 U.S. at 640) (emphasis added); *see also Brown v. Muhlenberg Twp.*, 269 F.3d 205, 211 n.4 (3d Cir. 2001) ("If the unlawfulness of the defendant's conduct would have been apparent to a reasonable

4

official based on the current state of the law, it is not necessary that there be binding precedent from this circuit so advising."). Instead the touchstone of our analysis is reasonableness: "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). And based on the state of the law on May 12, 2014, it is readily apparent to me that a reasonable officer would have known—based on the general constitutional principles delineated in our case law and *Green*'s pronouncement that *Lewis* does not apply to unilateral, non-emergency pursuits of a non-fleeing suspect—that the type of conduct exhibited by Officer Homanko was unconstitutional.

The three cases cited by the majority—two of which pre-date *Green* by several years—do not, in my opinion, alter this conclusion. When seeking guidance from our sister courts, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established." *L.R. v. Sch. Dist. of Philadelphia*, 836 F.3d 235, 248 (3d Cir. 2016) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (per curiam) (emphasis in original)). And the *particular* conduct at issue here is not found in either *Bingue v. Prunchak*, 512 F.3d 1169 (9th Cir. 2008), or *Helseth v. Burch*, 258 F.3d 867 (8th Cir. 2001) (en banc), as both of those cases centered on conduct that took place during the hot pursuit of a "fleeing" suspect and, as such, were clearly governed by *Lewis*. *See Bingue*, 512 F.3d at 1177 ("We conclude that high-speed police chases, by their very nature, do not give the officers involved adequate time to deliberate in either deciding to join the chase or how to drive while in pursuit of the *fleeing* suspect.") (emphasis added); *see also Helseth*, 258 F.3d at 872 ("[The suspect] was a *fleeing* criminal, whose irresponsible high-speed driving endangered

5

countless citizens and ultimately killed one innocent bystander and maimed another. . . .") (emphasis added).

Nor did *Sitzes v. City of West Memphis*, 606 F.3d 461 (8th Cir. 2010), involve the particular conduct at issue here. *Sitzes* involved an accident in February of 2007 when an officer responding to a reported robbery and assault drove his vehicle at speeds between 80 and 90 m.p.h. and collided in an intersection with another car, killing the innocent driver and injuring a passenger. The majority in *Sitzes* relied upon the fact that the officer in question subjectively believed that he was responding to an emergency in holding that the "intent to harm" standard, and not a "deliberate indifference" or "conscious disregard of a great risk of serious harm" standard, applied to the officer's conduct. Significantly, the majority plainly indicated that the "intent to harm" standard would *not* control where the officer did not subjectively believe that the situation presented a real emergency, stating:

> Although we are deeply troubled by Officer Wright's actions, we cannot say that the district court erred in applying the intent-to-harm standard in this case. First, we must reject plaintiffs' primary argument, which bases liability on the situation . . . not being a "true" emergency. *Terrell* forecloses inquiry into the objective nature of the emergency, as substantive due process liability turns on the intent of the government actor. 396 F.3d at 980. Thus, the fact that the situation . . . was not as serious as those presented in *Helseth* or *Terrell*, or that it might not qualify as an "emergency" under the [police department] Policy and Procedure manual, is not determinative of the appropriate level of scrutiny.

6

Neither is the fact, emphasized by the dissent, that Officer McDougal and others testified that they would never have driven in the manner that Officer Wright did, or that Officer McDougal responded to the situation . . . differently than Officer Wright. This would all be more relevant if our question was whether the situation was an objectively "true" emergency. However, it bears little relevance to the question of what Officer Wright subjectively believed. . . .

We agree with the dissent that our opinion should not be read to establish a rule that an officer can insulate himself from substantive due process liability, no matter the circumstances, by simply averring that he subjectively believed the situation to which he was responding was an emergency. *See Terrell*, 396 F.3d at 980 n. 2. This could lead to the absurd results forecasted by the dissent. For example, the dissent fears that this case could be used to insulate from substantive due process liability an officer who drove "100 miles per hour through a children's playground during recess time," or an officer who drove "the wrong way down an interstate highway ... when responding to something as routine as a reported accident requiring traffic control[,]" as long as the officer stated that he believed the situation to be an emergency. First, such cases are far beyond the factual scenarios of *Lewis*, *Helseth*, and *Terrell*, which involved officers using conventional emergency driving techniques to respond to perceived emergencies.

7

> Nothing in our opinion would countenance granting summary judgment in either of the two situations presented by the dissent. Second, we think it very likely that an officer who intentionally drove through a playground or the wrong way on an interstate highway could be held liable even under the intent-to-harm standard, regardless of the officer's avowed belief, at least absent some compelling exigency not described in the hypotheticals. In sum, we do not understand this case to establish a per se rule that an officer's self-serving affidavit will always insulate that officer from substantive due process liability. Instead, we simply hold that the plaintiffs have failed to create a genuine issue of fact as to Officer Wright's subjective belief and that this belief is not so preposterous as to reflect bad faith on the part of Officer Wright.

*Id.* at 468, 469-70. Thus, far from rejecting application of a conscious disregard standard to police conduct that did not concern an emergency situation, *Sitzes* actually suggests that such a standard does apply when it is clear that the officer was not confronted with an emergency situation. And in our case, we are in full agreement that "[t]here was no emergency at all, and Homanko likely did the most that was warranted when he radioed the police in a neighboring jurisdiction to stop the offender." Maj. Slip Op. at 6. The reliance in *Sitzes* on the officer's belief in that case that he faced an emergency situation can be read as providing notice to law enforcement officers that

8

they are not insulated from liability for engaging in egregiously reckless criminal conduct in a non-emergency context.[2]

*Green* on the other hand—as the majority plainly recognized—"arose in a non-emergency setting and did not involve a suspect fleeing the police in a dangerous manner." Maj. Slip Op. at 14. Those facts—again as the majority recognized—are akin "to the allegations in this case. . . ." *Id*. The majority is correct in its assertions that "[w]hen qualified immunity it at issue, context matters" and that courts must "take into account the 'particularized' facts of a case." Maj. Slip Op. at 11. *Green*, therefore, is the only case that addresses the context and *particularized* conduct at issue here. And when read in conjunction with the "general constitutional rule already identified in the decisional law," it is evident—indeed, "obvious"—that a reasonable officer would have known on May 12, 2014, that Officer Homanko's admittedly criminal

---

[2] Contrary to the majority's assertion, we do not minimize the import of the Ninth Circuit's holding in *Bingue* or the Eighth Circuit's holding in *Helseth*. Instead, we rely upon the Eighth Circuit's post-*Helseth* and post-*Bingue* careful delineation between emergency and non-emergency situations articulated in *Sitzes*..We also rely and on the Tenth Circuit's holding in *Green* that the intent to harm standard does not apply in the non-emergency context to conclude that a reasonable police officer would know in May of 2014 that the type of conduct engaged in by Homanko was conscience-shocking such that liability could be imposed.

9

conduct was unconstitutional.[3]  *Kedra*, 876 F.3d at 450 (citation omitted).

---

[3] It bears reiterating that Officer Homanko pled guilty to vehicular homicide and reckless endangerment.  A reasonable officer engaged in criminal conduct that resulted in the loss of life and severe personal injuries in a violent collision surely would understand that his conduct would be regarded as sufficiently conscience-shocking so as to preclude the defense of qualified immunity.  Indeed, it would appear that his guilty plea would defeat the defense of official immunity under Pennsylvania tort law that would otherwise be available to Officer Homanko for engaging in conduct that fell within the scope of his duties.  *See* 42 Pa.C.S.A. § 8550 (application of official immunity otherwise available under 42 Pa.C.S.A. § 8446(2) is foreclosed where "it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct.").  This reinforces the conclusion that a reasonable law enforcement officer would understand that he could not take another person's life through criminal conduct and yet retain qualified immunity.  Notably, in *Kane v. Barger*, No. 17-3027, --- F.3d ---, 2018 WL 4000068, at *7 (3d Cir. Aug. 22, 2018), we held that a law enforcement officer's conduct that merely "resemble[d] the crime of indecent assault" – the officer had touched the plaintiff's intimate parts for his own gratification – was such that "given the egregiousness of [defendant's] violation of [plaintiff's] personal security and bodily integrity, the right here is so 'obvious' that it could be deemed clearly established even without materially similar cases."  So, too, here the obviousness of Officer Homanko's violation of the plaintiffs'

Our decision in *Kedra* supports this conclusion. There, the mother of a Pennsylvania State Trooper brought a § 1983 claim against a police instructor who accidentally shot a loaded handgun into the trooper's chest during a routine training session, killing him. *Kedra*, 876 F.3d at 432. The complaint alleged that the officer's conduct was conscience shocking because he "bypassed all of the safety checks [and] failed to physically or visually inspect the gun to ensure it was unloaded" before pulling the trigger. *Id.* at 433. Like the majority here, we concluded in *Kedra* that the allegations gave rise to the inference that the officer "acted with actual knowledge of a substantial risk of lethal harm" so as to shock the conscience under a then-clearly established theory of deliberate indifference. *Id.* at 448 (citations omitted). We then turned to the question of whether the right at issue—*i.e.*, "an individual's right not to be subjected, defenseless, to a police officer's demonstration of the use of deadly force in a manner contrary to all applicable safety protocols"—was clearly established on the date in question. *Id.* at 449 (footnote omitted). After reciting the general constitutional rules identified in our decisional law and analyzing the facts of a "closely analogous case from the First Circuit," we concluded that a reasonable officer would have had fair warning that the conduct at issue was constitutionally prohibited on the date in question. *Id.* at 450–52 (citation omitted).

The same conclusion applies here. The general constitutional principles are clear. *Green* applied those principles to an analogous set of facts. The unconstitutional

---

rights to life and bodily integrity defeats the defense of qualified immunity even in the absence of materially similar cases.

11

nature of Homanko's actions, placing at substantial risk those traveling a two-lane, undivided highway in recklessly criminal pursuit of an unsuspecting motorist for a minor traffic infraction, was clearly established when he slammed into the Sauers' vehicle, mortally injuring Mrs. Sauer and severely injuring her husband.

I respectfully dissent.