**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 25-1283

———————

ESTATE OF FRANCES D. DEROSA, by and through her Administrator Prosequendum,
Lisa DeRosa-Palisi; THE ESTATE OF MARGARET MACKENZIE, by and through her
Administrator Prosequendum, Cindy Gilsenan; THE ESTATE OF RUSSELL MURRAY,
by and through his Administrator Prosequendum, Tracey Tagliente, individually and on
behalf of others similarly situated,

                                                                        Appellants,
                                        v.

GOVERNOR PHILIP D. MURPHY, the Governor of the State of New Jersey, in his
individual capacity; COMMISSIONER JUDITH M. PERSICHILLI, Commissioner of
the New Jersey Department of Health, in her individual capacity; JOHN DOES A-Z

———————

Appeal from the United States District Court
for the District of New Jersey
(District Court No. 1:22-cv-02301)
District Judge: Honorable Edward S. Kiel

———————

Submitted under Third Circuit L.A.R. 34.1(a)
January 16, 2026

Before: SHWARTZ, CHUNG, and AMBRO, Circuit Judges

(Opinion filed January23, 2026)

———————

OPINION[*]

———————

_____

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not
constitute binding precedent.

AMBRO, Circuit Judge

Approximately 10,000 elderly residents of New Jersey nursing homes and veterans' homes died during the COVID-19 pandemic. Three of their estates sued the Governor, Health Commissioner, and other New Jersey officials, attributing these deaths to a flawed public health policy that deliberately under-prioritized the safety of nursing homes. Plaintiffs brought claims under the United States Constitution and the Federal Nursing Home Reform Act (FNHRA), 42 U.S.C. § 1396r. The District Court granted the State officials' motion to dismiss on the basis of qualified immunity.

Plaintiffs suffered tragic losses during the pandemic. But because they have not made the legal showing required to overcome qualified immunity, we affirm.

**I**

Plaintiffs are the daughters and estate administrators of three private-nursing-home residents—Frances D. DeRosa, Margaret MacKenzie, and Russell D. Murray—who died in April and May 2020 after contracting COVID-19. They ascribe these deaths to policies promulgated by the New Jersey Department of Health. The following facts are taken from Plaintiffs' complaint, which we accept as true at this procedural stage. *See Stringer v. County of Bucks*, 141 F.4th 76, 84 (3d Cir. 2025).

In March 2020, New Jersey Governor Philip D. Murphy issued an executive order declaring the COVID-19 pandemic a public health emergency. Three weeks later, New Jersey Department of Health Commissioner Judith M. Persichilli issued a directive to implement the executive order. To ensure hospital bed capacity, the directive prohibited

2

post-acute care facilities such as the decedents' nursing homes from (1) denying admission or re-admission to patients/residents who tested positive for COVID-19 or (2) requiring hospitalized but "medically stable" patients/residents to be tested for COVID-19 before admission or re-admission. J.A. 167, ¶¶ 10–11.

Plaintiffs allege reasons to criticize the directive. Two weeks before its issuance, the Centers for Disease Control and Prevention published a report advising that substantial mortality might be averted if long-term care facilities acted quickly to prevent exposure of their residents to COVID-19. But New Jersey had no plans in place to distribute personal protective equipment ("PPE") to nursing homes at the time of the directive, despite warnings from facilities that they did not have the PPE supplies necessary to manage patients from hospitals. Further, most nursing homes are small, older buildings without upgraded ventilation. Nevertheless, the revenue associated with hospital patients incentivized nursing homes to accept them.

"[W]arned" that long-term care facilities "did not have sufficient supplies of PPE or the ability to manage [] highly infectious patients," Defendants implemented the directive anyway. J.A. 171, ¶ 29. During a conference call with nursing home administrators immediately after the directive's issuance, administrators told Commissioner Persichilli that separation was not feasible, contamination was almost certain, and the directive would lead to unnecessary deaths. The day after the issuance, 99 facilities called the New Jersey Department of Health (the "Department") to report they did not have enough resources to separate patients. That same day, three professional organizations issued a joint statement urging against New York's directive,

3

after which New Jersey's was modeled, based on COVID-19 data from a Washington State nursing home. Within a week, 200 facilities notified the Department they could not accept new admissions. A group of anonymous Department employees issued an open letter criticizing the directive along with the Department's leadership and advocating for more PPE and testing for nursing homes. The letter charged Commissioner Persichilli, a former hospital CEO, with using arbitrary PPE allocation guidelines to shortchange nursing homes in favor of acute-care hospitals.

By the waning of the pandemic, New Jersey's nursing homes had a per-capita COVID-19 death rate of 16%, the worst in the country. Approximately 10,000 elderly residents of nursing homes and military veterans' homes died in New Jersey. These included the decedents in this case, each of whom died a week after he or she was diagnosed with COVID-19. Eventually, New Jersey reached a $53 million settlement with the families of 119 seniors who died in state-run veterans' homes.

In 2022, Plaintiffs each brought a lawsuit under 42 U.S.C. § 1983 and its New Jersey corollary, N.J. Stat. Ann. § 10:6-2(c), against Governor Murphy, Commissioner Persichilli, and unnamed State officials.[1] The claims on behalf of each estate were consolidated into one amended complaint, which alleged violations of statutory rights under the FNHRA and constitutional rights to life, safe conditions, bodily integrity,

---

[1] The New Jersey Civil Rights Act is analogous to 42 U.S.C. § 1983 and is likewise "a means of vindicating substantive rights and [] not a source of rights itself." *Gormley v. Wood-El*, 93 A.3d 344, 358 (N.J. 2014). Plaintiffs' claim under the New Jersey Civil Rights Act reiterated the same alleged rights violations as their § 1983 claim. J.A. 200, ¶¶ 159–161.

freedom from state-created danger, and freedom from cruel, unhuman, or degrading treatment.

Defendants moved to dismiss. The District Court granted the motion on the basis of qualified immunity. *See Estate of DeRosa v. Murphy*, No. 22-cv-02301, 2025 WL 249169 (D.N.J. Jan. 21, 2025). Plaintiffs appeal to us.

The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(4), and 1367(a). We have jurisdiction under 28 U.S.C. § 1291. "We review [a] district court's grant of qualified immunity de novo as it raises a purely legal issue." *Burns v. Pa. Dept. of Corr.*, 642 F.3d 163, 170 (3d Cir. 2011) (citation omitted). As noted, at the motion-to-dismiss stage, we "accept all plaintiffs' allegations as true and draw all inferences in their favor." *Stringer*, 141 F.4th at 84 (cleaned up).

## II

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). The doctrine seeks to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. Therefore, "officials do not get stripped of qualified immunity every time a judge, with the clarity afforded by hindsight, believes that an official has committed a wrong." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 719 (3d Cir. 2018). Qualified immunity "protects even those officials who exercise

5

extraordinarily poor judgment" from liability for civil damages unless a plaintiff can satisfy the requirements for overcoming it. *Id.* (citing *al-Kidd*, 563 U.S. at 743).

To do so, a plaintiff must make two showings. "One is [that] the defendant's conduct violated a statutory or constitutional right. The other is [that] the right at issue was clearly established when the conduct took place. We have discretion to address either inquiry first." *Sauers*, 905 F.3d at 716 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). Here, we choose to begin with the second inquiry, which is enough to resolve this case.

Plaintiffs do not need a factually identical prior case to show that their asserted right was clearly established, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017) (per curiam)). Existing precedent places the question beyond debate "only if it is controlling authority in the relevant jurisdiction, or if a robust consensus of cases of persuasive authority in the Court of Appeals has settled the question." *Sauers*, 905 F.3d at 719 (cleaned up).

The Supreme Court has instructed courts "not to define clearly established law at a high level of generality." *Kisela*, 584 U.S. at 104 (quoting *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 613 (2015)). Although "general statements of the law are not inherently incapable of giving fair and clear warning," *id.* at 105 (quoting *White*, 580 U.S. at 79), a government official violates a clearly established right only if "the right's contours were sufficiently definite that any reasonable official in the

6

defendant's shoes would have understood that he was violating it," *id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014)).

What this means is the particular facts matter. "[O]nly when both the theory of liability and its application to the established facts are sufficiently plain [is] the legal question of liability [] beyond legitimate debate," allowing a plaintiff to defeat the qualified immunity defense. *Sauers*, 905 F.3d at 719 (citing *Kedra v. Schroeter*, 876 F.3d 424, 435–36 (3d Cir. 2017)).

Plaintiffs do not identify any cases meeting this standard for any of their claims. To explain this failure, they repeatedly cite *Hope v. Pelzer*, 536 U.S. 730, 741 (2002), for the proposition that they are not required to identify precedent with "fundamentally similar" facts. True enough. But simply repeating a statement of what they are *not* required to do cannot excuse Plaintiffs from what the law *does* require: "controlling authority in the relevant jurisdiction, or . . . a robust consensus of cases of persuasive authority" giving Defendants "fair warning that [their] actions were unconstitutional in the particular factual scenario [they] confronted." *Sauers*, 905 F.3d at 719 (cleaned up).

## III

We begin with the constitutional claims. Plaintiffs assert four rights under substantive due process: to be free from cruel, unhuman, or degrading treatment; to safe conditions; to life; and to bodily integrity under the state-created danger doctrine.

***Right to be free from cruel, unhuman, or degrading treatment.*** Plaintiffs argue Defendants' conduct self-evidently violated the "universally accepted customary human rights norm" of freedom from "cruel, unhuman or degrading treatment." Appellants' Br.

7

44.  In support, they cite four out-of-circuit cases involving suits against foreign sovereigns.  *Id.* (citing *Abebe-Jira v. Negewo*, 72 F.3d 844 (11th Cir. 1996) (addressing Alien Tort Claims Act claim against official of former Ethiopian government); *de Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385 (5th Cir. 1985) (applying Foreign Sovereign Immunities Act to claim against Nicaraguan Central Bank); *Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995) (addressing Torture Victim Protection Act and Alien Tort Claims Act claims against former Guatemalan Minister of Defense); *Paul v. Avril*, 901 F. Supp. 330 (S.D. Fla. 1994) (addressing Alien Tort Claims Act claims against former Haitian military ruler)).[2]  They also cite a fifth case, *Jama v. U.S. Immigr. & Naturalization Serv.*, 22 F. Supp. 2d 353 (D.N.J. 1998), brought under the Alien Tort Claims Act on behalf of alien asylum seekers against the Immigration and Naturalization Service and several of its officials and contractors, alleging mistreatment under federal, state, and international law.  *See* Appellants' Br. 44.  Plaintiffs do not attempt to explain why these cases are relevant to their claim or would have put New Jersey officials on notice that their public health policy violated a constitutional right.

   ***Right to safe conditions.***  Plaintiffs' safe-conditions argument, which they ground in the Eighth Amendment, involves two steps.  First, they analogize the decedents to prisoners or involuntarily committed patients on the theory that "nursing homes were locked down with all visitation prohibited" and that "[r]esidents were subject to extensive

---

[2] Two of these cases are out-of-circuit district court cases, which are irrelevant to Plaintiffs' task of demonstrating "controlling authority in the relevant jurisdiction, or . . . a robust consensus of cases of persuasive authority in the Court of Appeals."  *Sauers*, 905 F.3d at 719 (cleaned up).

surveillance, [prohibited from] communal and group activities, [and] largely confined to their rooms." Appellants' Br. 46. According to Plaintiffs, this "State-sanctioned isolation and confinement" rendered nursing home residents "equivalent [to] incarcerated prisoners, triggering a special duty on the part of Defendants to keep them safe." *Id.* Second, they argue Defendants failed to uphold that duty.

Plaintiffs' argument fails at the first step. True, "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 199–200 (1989). But the decedents were voluntary residents of private nursing homes, not involuntarily institutionalized. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Id.* at 200. Plaintiffs' complaint does not contain any allegation that New Jersey compelled the decedents to reside in the nursing homes against their will.

***Right to life.*** For their asserted right to life under the Fourteenth Amendment's substantive Due Process Clause, Plaintiffs provide no cases with any connection to the facts in this case, instead gesturing at a wide range of disparate cases discussing life and death. *See, e.g., County of Sacramento v. Lewis*, 523 U.S. 833 (1998) (addressing high-speed police chases); *Washington v. Glucksberg*, 521 U.S. 702 (1997) (addressing physician-assisted suicide); *Cruzan ex rel. Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261 (1990) (addressing termination of artificial hydration and nutrition for patient in

9

persistent vegetative state).  From these cases, Plaintiffs derive the general principle that States ought to protect life and summarily conclude that New Jersey's policy violated this principle.

Plaintiffs fail to "frame clearly established law in light of the specific context of the case, not as a broad general proposition." *Mammaro v. N.J. Div. of Child Prot. & Permanency*, 814 F.3d 164, 169 (3d Cir. 2016) (internal quotation marks omitted). Because they do not identify any cases putting Defendants on notice that the directive violated a "right to life," Plaintiffs cannot overcome the qualified immunity defense.

***Right to bodily integrity under the state-created danger doctrine.*** Plaintiffs dedicate most of their briefing on this claim to arguing that Defendants' conduct meets the four-prong test for a state-created danger claim under the Fourteenth Amendment.[3] However, their argument against qualified immunity fails on the separate question of "whether the right at issue was clearly established when the conduct took place," *Sauers*, 905 F.3d at 716.  With respect to that question, Plaintiffs cite a single case:  a district court case regarding officials' decision to open the floodgates of a dam without closing

---

[3] Claims under the state-created danger doctrine require plaintiffs to plead four elements:
> (1) [t]he harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the conscience;
> (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and
> (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Sauers*, 905 F.3d at 717 (alteration in original) (quoting *Haberle v. Troxell*, 885 F.3d 170, 176–17 (3d Cir. 2018)).

10

an affected road.  *See* Appellants' Br. 57–58 (discussing *Van Orden v. Borough of Woodstown*, 5 F. Supp. 3d 676 (D.N.J. 2014)).  But a single district court decision is neither "controlling authority" nor a "robust consensus of cases of persuasive authority" for the purposes of qualified-immunity analysis.  *See Sauers*, 905 F.3d 719, 722 (citations omitted).  Moreover, the Court of Appeals for the Second Circuit summarily affirmed dismissal of a similar claim on qualified immunity grounds, likewise finding no clearly established right was violated.  *See Arbeeny v. Cuomo*, No. 24-2856, 2025 WL 3079217, at *3 (2d Cir. Jan. 10, 2025) (not precedential).

Because Plaintiffs have not alleged the violation of a clearly established right, none of their constitutional claims survive Defendants' qualified immunity defense.

**IV**

Plaintiffs fare no better on their statutory claim.  They cite some FNHRA provisions and related regulations that do appear to contain rights-creating language.  *See Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 172 (2023) (holding that two other FNHRA provisions—not at issue here—do confer rights enforceable under § 1983 against state-run nursing facility); *Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 525–31 (3d Cir. 2009) (same for three FNHRA provisions at issue here, among others); *Three Rivers Ctr. for Indep. Living v. Housing Auth.*, 382 F.3d 412, 424 (3d Cir. 2004) (setting out test for whether agency regulation is within scope of rights-creating statute).  But these provisions impose obligations on nursing facilities, not State officials.  *See, e.g.,* 42 U.S.C. § 1396r(d)(3)(A) ("A nursing facility must . . . establish and maintain an infection control program . . . ."); *id.* § 1396r(b)(1)(A) ("A

11

nursing facility must care for its residents in such a manner and in such an environment as will promote maintenance or enhancement of the quality of life of each resident."). Accordingly, it is not clearly established that these provisions create rights enforceable against Defendants.

Moreover, several of the FNHRA rights allegedly violated are defined too broadly to give Defendants notice that their particular conduct was unlawful. For example, 42 C.F.R. § 483.10(a) is a broad statement of residents' rights "to a dignified existence, self-determination, and communication" and to "an environment that promotes maintenance or enhancement of his or her quality of life, recognizing each resident's individuality." Another section, 42 C.F.R. § 483.10(e), establishes a "right to be treated with respect and dignity."[4] And 42 C.F.R. § 483.10(f)(2) provides a "right to make choices about aspects of his or her life in the facility that are significant to the resident" as a part of a broader right to "self-determination through support of resident choice." On their own, these abstract principles do not provide clear notice that Defendants' conduct would violate the decedents' rights. And Plaintiffs do not identify any precedent applying these high-level provisions to specific facts, as required to place the question "beyond debate." *al-Kidd*, 563 U.S. at 741.

\*     \*     \*     \*     \*

We do not doubt the pain of Plaintiffs' losses during the pandemic or the imperfection of New Jersey's response to it. But qualified immunity gives State officials

---

[4] Although this section does include a list of more specific examples—such as rights to be free from restraints, choose roommates, and refuse transfers—none are relevant here.

12

"the benefit of all reasonable doubt in the exercise of their professional duties." *Sauers*, 905 F.3d at 719–20. To overcome qualified immunity, the law requires certain showings, and Plaintiffs fall far short of making those showings. Therefore, we must affirm the District Court's determination that Defendants are entitled to qualified immunity and its dismissal of the claims against them.